[No. 12342–4–I.    Division One.    May 20, 1985.]

PAMELA T. AMOSS, *Appellant,* v. THE UNIVERSITY
OF WASHINGTON, ET AL, *Respondents.*

*Schroeter, Goldmark & Bender* and *J. Kathleen Learned,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Steve Milam, Assistant,* for respondents.

*Kimberly A. Boyce* and *Joan Andersen* on behalf of Northwest Women's Law Center, *Steven T. Russell* on behalf of the American Association of University Professors, and *Charles M. Henderson* on behalf of the American Civil Liberties Union, amici curiae for appellant.

COLEMAN, J.—Pamela Amoss appeals from a superior court order affirming a decision by the University of Washington denying her tenure. She contends that she was denied tenure because of sex discrimination and the effects of that discrimination on the evaluation of her record. She further alleges errors of law and procedure throughout the

University's decisionmaking process.[1] We affirm.

Dr. Amoss' background is as follows: In 1967, Dr. Amoss was admitted to the Anthropology Department of the University as a graduate student. She received her Ph.D. from the University in 1972 and then obtained a 1-year appointment as an acting assistant professor in the Department. In the fall of 1973, Dr. Amoss joined the anthropology faculty as an assistant professor. Her employment with the University was continuous except for a 1-year leave on a fellowship.

We first examine the procedures employed by the University in evaluating Dr. Amoss' qualifications for tenure. The University's procedures for tenure and promotion are set forth in the Faculty Code. 2 U. of Wash. Handbook, Part 2, § 21–26 (rev. ed. 1972). Assistant professors must be reviewed for tenure in the sixth year of a tenure–track appointment. Faculty Code § 24–41(B). Thus, in the fall of 1979, consideration of Dr. Amoss for tenure was mandatory.

The initial tenure recommendation must be made by a majority of the eligible voting faculty of the Department. Faculty Code §§ 13–24, 23–46(B), 25–41(B). Under Faculty Code § 21–32(A), part–time retired faculty are permitted to vote, but under Faculty Code § 21–32(B), faculty on leave are not voting members. Thirteen out of the eighteen faculty in the Department plus the chair of the Department, Dr. Robert C. Dunnell, met on October 4, 1979, to consider Dr. Amoss for tenure. After discussing Dr. Amoss' materials and background, the faculty voted 8 to 4 in favor of granting tenure, with one abstention. The chair did not participate in the Department vote on tenure because he wrote a separate recommendation.

Guidelines issued in September 1979 by the acting dean of the College of Arts and Sciences direct the Department

---

[1]We have received amici curiae briefs on behalf of the following groups in support of Dr. Amoss: the Northwest Women's Law Center, the American Civil Liberties Union of Washington Foundation, and the American Association of University Professors, University of Washington Chapter.

chair to write a letter to the dean of the college reporting the results of the departmental faculty vote and summarizing the basis or reasoning behind each vote. The guidelines state that the chair should include his own independent recommendation. The guidelines provide that other data, including one copy of each of the candidate's publications or other evidence of achievement, are to be submitted to the dean. The dean, advised by the college council, then makes his recommendation to the president, who may confer tenure. In conferring tenure, the president acts on behalf of the Board of Regents. Faculty Code § 25–41(B).

On October 10, 1979, Dr. Dunnell wrote to Dean Ernest Henley of the College of Arts and Sciences, describing the faculty discussion and reporting the faculty vote. The record contains a great deal of testimony about the accuracy, tone, and impact of this letter and the extent to which it was relied upon in the subsequent decisions to deny Dr. Amoss tenure. Three faculty members who voted in favor of Dr. Amoss' tenure testified in detail why they believed that the letter contained a "misstatement of the opinions expressed in the meeting" and had "a very strongly negative cast" which did not reflect the Department discussion. However, one member who voted in favor of Dr. Amoss testified that the letter was, in general terms, "a fair representation of the discussion". Two other faculty who voted against Dr. Amoss stated that the letter was an accurate portrayal of the meeting.

Dr. Dunnell had solicited opinions from the four on-leave faculty members, and he attached their written responses to his report. At the end of his letter to the dean, Dr. Dunnell gave his independent recommendation. He concurred in the Department's recommendation but stated that he had reached a decision with difficulty and that he was "loathe to support lower standards and thus initially strongly tended to side with the negative assessments" of Dr. Amoss. In Dr. Dunnell's opinion, "all of the deficiencies from poor academic judgment, suspect motivation, to non-theoretical orientation are manifestations of a single under-

lying characteristic of Dr. Amoss: professional insecurity." Nevertheless, he concluded that this problem would be surmounted once Dr. Amoss received tenure.

Dr. Amoss' materials and Dr. Dunnell's letter were considered by the dean and the college council on October 24, 1979. The college council is an 8–member body elected by the faculty. The council considers each tenure candidate and advises the dean on the recommendation he is to make to the president. The council voted 7 to 1 to deny tenure.

On November 5, 1979, two members of the anthropology faculty wrote to the associate dean of the College of Arts and Sciences expressing their surprise and regret over the recommendation to deny tenure. These two faculty members requested that the council reconsider its decision. A week later, on November 12, 1979, Dean Henley wrote to President William P. Gerberding, reporting the Department vote and Dr. Dunnell's opinion as well as the council's recommendation to deny tenure. Dean Henley concurred in the council's decision, stating:

> It is the judgment of the College Council and my own judgment that Assistant Professor Amoss's record lacks sufficient quality in research and in advanced–level teaching to warrant tenure and promotion. This evaluation is explained more fully by Professor Dunnell in his assessment of the negative departmental votes and in the arguments against tenure which he considered in making his own judgment.

On January 5, 1980, Provost George Beckmann advised Dean Henley of his concern that the dean and council had overturned a favorable recommendation by the Department. Provost Beckmann asked the council to reconsider the matter. The provost forwarded to Dean Henley materials which had been sent to him since the council's October 24, 1979 decision. These included enthusiastic recommendations from well known faculty in Dr. Amoss' field at other universities. On January 15, 1980, the council met again, considered the new material, and voted 8 to 0 to deny tenure. On January 18, 1980, in a letter to Dean Hen-

ley, Provost Beckmann concurred in the recommendation of denial. Dean Henley wrote Dr. Amoss on January 23, 1980, to inform her of the decision to deny her tenure.

Dr. Amoss appealed to the tenure committee for a hearing under Faculty Code §§ 25-62 and 25-64. After a hearing which took place on May 17, 21, and 23, 1980, the committee voted 3 to 2 in favor of Dr. Amoss, finding "sufficient evidence to support the complainant's allegations regarding procedural error and sex discrimination." The majority concluded that Dr. Dunnell technically had conformed with the college and University rules but that his inclusion of letters from on-leave faculty, exclusion of letters from outside faculty, and the negative tone of his letter "could have so prejudiced the review by the College Council and the Dean of Arts and Sciences as to have precluded a decision in favor of tenure." Reviewing Dr. Amoss' career, the majority found that the absence of professional support in the Department and the "disdain" that was expressed for her "may have started Dr. Amoss down a unique career path that would influence adversely the contacts with departmental colleagues and further alienate her from those who could have and should have counseled her."[2] The majority stated:

the procedures followed by the Chair of the Department of Anthropology, which resulted in a weak recommendation for tenure, when combined with her treatment and experiences in the Department could only have resulted in a denial of tenure and promotion at the College level.

Finally, the majority concluded that Dr. Amoss "was denied

---

[2]In 1967, when Dr. Amoss was admitted to the Anthropology Department, her husband was a part-time faculty member in the Department; therefore, the Department imposed the condition on Dr. Amoss' graduate program that her advisory committee "should be chosen from among those members of the faculty who are not associated closely with you as personal friends." A reputed expert in the subject Dr. Amoss chose to pursue was a "personal friend;" consequently, Dr. Amoss was appointed a different adviser. Moreover, at the tenure committee hearing, a member of the anthropology faculty testified that early in Dr. Amoss' employment as a faculty member he and other colleagues referred to Dr. Amoss as the "Bellevue housewife."

tenure because of direct sex discrimination and the effects of that discrimination on the procedures followed in compiling and evaluating her record." The majority recommended revoking or setting aside the decision of the dean and college council, granting Dr. Amoss an additional 1–year appointment, and reconsidering her as a candidate for tenure in the fall of 1981. If tenure was denied at that time, Dr. Amoss' appointment would terminate in July 1982.

The dissenting members of the tenure committee concluded that

> unpleasant, uncooperative, and non–supportive as he may be, Prof. Dunnell did not invoke any sex discrimination against the complainant.
>
> Beyond him, to the level of the College Council and Dean Henley, we believe the case for sex discrimination is wholly groundless. That is, we are persuaded that both the College Council and Dean Henley are completely free from sex prejudice and that they arrived at their decision wholly on the basis of their review of the complainant's accomplishments and qualities, not affected by any distortion in any part of the record before them. We are persuaded that they relied strongly on the complainant's writings and that Dean Henley, particularly, was perceptive enough to make, and did make, a realistic, accurate appraisal.

The minority report stated that the strongest case of sex discrimination was at the Department level. According to the minority, the evidence showed that any discrimination was mostly attributable to one tenured female Department faculty member whose letter had been attached to Dr. Dunnell's report, but the connection between this alleged discrimination and Dr. Dunnell was "remote at best."

On July 2, 1980, Dean Henley appealed to the president of the University under Faculty Code § 25–62(G)(4). Dr. Amoss and Dean Henley submitted briefs and documents they wished to place before the president. President Gerberding also received two memoranda from Senior Assistant Attorney General James Wilson. Mr. Wilson was chief

of the University of Washington Division of the Attorney General's Office and legal adviser to the president of the Board of Regents. An assistant attorney general in the same division, Steve Milam, represented Dean Henley in the proceedings concerning Dr. Amoss.

President Gerberding heard oral argument on October 29, 1980. On November 17, 1980, the president rejected the tenure committee's recommendation and concurred with the dean's advice to deny tenure. The president wrote:

> My review of the record convinces me neither the Dean of the College of Arts and Sciences nor the College Council was affected by whatever prejudice Professor Amoss contends and the Committee majority is persuaded to have existed within the Department of Anthropology. I am further convinced that their action in not accepting the recommendation of the Department for Professor Amoss' promotion and tenure was not affected by prejudice or discrimination on the basis of sex, but rather was done honorably on the merits and with the legitimate needs of the College and Department in mind. I note that the matter was reviewed twice by both the Dean and the College Council and in the latter review, following the request of Provost Beckmann, that the College Council's opinion was unanimous that Professor Amoss not be promoted nor granted tenure.
>
> Having reached the above conclusion, I think nothing would be served by remanding this matter back to the Tenure Committee for further consideration.

On November 21, 1980, Dr. Amoss appealed to the Board of Regents under Faculty Code § 25–62(H)(4), (I)(1). The parties waived submission of additional briefs and oral argument. The Board reviewed the materials presented to the president. On December 12, 1980, the Board informed the parties:

> [t]he unanimous decision of the Board is to uphold the decision of the President. Therefore, the appeal of Professor Amoss is dismissed and the appointment of Dr. Amoss as an assistant professor in the Department of Anthropology will terminate at the end of academic year 1980–81.

On January 9, 1981, Dr. Amoss petitioned the King County Superior Court for judicial review of the Board's decision under RCW 28B.19.150. On September 17, 1982, the court affirmed the decisions of the Board and the president. This appeal followed.

This court's review is governed by RCW 28B.19.150(6), which provides:

> The court may affirm the decision appealed from, or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (a) In violation of any state or federal constitutional provision; or
>
> (b) In excess of the statutory authority or jurisdiction of the institution; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or
>
> (e) Clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
>
> (f) Arbitrary or capricious.

Thus, our overriding concern is whether substantial rights of Dr. Amoss were prejudiced by the findings, inferences, conclusions, or decisions of the president and the Board of Regents for any of the reasons listed in RCW 28B.19-.150(6).

### Scope of President's and Board's Review

A dominant theme in Dr. Amoss' appeal is that the tenure committee's findings and conclusions were final. Consequently, she argues, the president and Board of Regents denied her due process by applying overly broad standards of review, making independent judgments, and reviewing only part of the record. To address these contentions, we must further discuss the structure of tenure decisionmaking at the University of Washington, keeping in mind the roles of the Department, the college council, and the dean.

The tenure committee is a special 5–member committee of the faculty appointed by the faculty senate. Faculty

Code § 25–61(A), (C).

> The functions of the Tenure Committee shall be to conduct hearings, make findings, and state its conclusions to the parties concerned whenever dismissal, including denial of tenure . . . is at issue, as set forth in Section 25–64. *These functions shall include acting on such complaints as may allege discrimination because of* race, religion, color, *sex,* national origin, age, or handicap. The Committee serves to protect the rights of both the individual concerned and the University. In a larger sense it fulfills an important role in protecting the academic profession from infringement of the prerogatives necessary for its proper functioning . . .

(Footnote omitted. Italics ours.) Faculty Code § 25–61(B). After a tenure committee hearing, the committee is required to "make written findings with respect to each of the grounds for removal presented and state its conclusions regarding them." Faculty Code § 25–62(G)(2).

> The decision of the Tenure Committee shall close the matter unless either the faculty member or the charging authority shall file notice of appeal of the decision to the President . . .

Faculty Code § 25–62(G)(4). Review of a tenure committee decision is governed by Faculty Code § 25–62(H):

> 1. At the written request of the faculty member or the charging authority, the President shall review the case. . . .
>
> . . .
> 3. If the President *disagrees with the decision of the Committee, he may reverse the Committee's decision, giving his reasons in writing,* and the matter shall be deemed closed unless the faculty member files notice of appeal of the decision to the Board of Regents . . .; or the President may return the matter to the Tenure Committee with his objections specified. . . .

(Italics ours.)

The president may also affirm the decision. Faculty Code § 25–62(H)(2). Faculty Code § 25–62(H)(3) clearly indicates that the president may "disagree" with the tenure committee decision. This language implies that the president has the power of independent decisionmaking rather than the

more restrictive "appellate review" approach urged by Dr. Amoss.

The Board's power of review is similar:

1. If the decision of the President is adverse to the faculty member, at the written request of the faculty member, the Board of Regents shall review the case. . . .

2. If the Board of Regents affirms the decision of the Tenure Committee, the matter shall be deemed closed. *If the Board disagrees with the decision of the Tenure Committee, the Board may make a final decision to this effect and thereby bring the case to a conclusion,* or it may return the matter to the President for referral to the Tenure Committee with its objections specified. . . .

(Italics ours.) Faculty Code § 25–62(I).

Any ambiguity in the Faculty Code as to who makes the final tenure decision is resolved by other provisions of the Faculty Code and the statutes.

A *recommendation* that the assistant professor be granted or denied tenure shall be sent to the dean of his school or college. This recommendation shall be based upon a majority vote of the professors and associate professors of his department, or of his school or college if it is not departmentalized. If the chairman does not concur in the recommendation he may also submit his own recommendation. *The dean,* advised as prescribed in Section 24–54C, *shall then make his recommendation to the President, and if tenure is to be granted it shall be conferred by the President acting for the Board of Regents.*

(Italics ours.) Faculty Code § 25–41(B).

The statutes confirm that the Board of Regents has the final power in the structure of decisionmaking, but the president and faculty share the responsibilities for immediate government of the University. The faculty of the University consists of the president and the professors; together, these individuals govern the institution under rules prescribed by the Board of Regents. RCW 28B.20.200. The Board of Regents has "full control of the university", RCW 28B.20.130(1), as well as the power and duty "[t]o employ the president . . ., [and] members of the faculty, . . . who except as otherwise provided by law, shall hold

their positions during the pleasure of said board of regents." RCW 28B.20.130(2).[3] Thus, the Faculty Code and the statutes vest the final tenure decision in the Board or in the president acting for the Board.[4]

---

[3]The University rules reiterate the statutory policy of shared governance of the institution. 2 U. of Wash. Handbook, Part 1 (rev. ed. 1972). Specifically, in § 13-23(A),

the President authorizes the University faculty to formulate regulations for the immediate government of the University and to share responsibility with him and the academic deans in such matters as:

. . .

5. criteria for faculty tenure, appointment, and promotion;

. . .

7. formulation of procedures to carry out the policies and regulation[s] thus established.

This authority is subject to the president's approval: "A faculty action under the provisions of paragraph A of this Section shall become effective upon its approval by the President." 2 U. of Wash. Handbook § 13-23(C).

[4]The role and authority of the tenure committee and the Board at the University of Washington is similar to the positions of analogous bodies in other universities and colleges. *See, e.g., Zahorik v. Cornell Univ.,* 729 F.2d 85, 88-89 (2d Cir. 1984) (independent levels of review in tenure decision process); *Ranyard v. Board of Regents,* 708 F.2d 1235, 1237-38 (7th Cir. 1983) (according to governing policy of state university, board of regents delegates authority to university officers, but cannot divest itself of its ultimate legal responsibility regarding faculty appointment; hearing board is "advisory" to president, who, on appeal, can affirm, modify or reverse a decision of the hearing board); *Kunda v. Muhlenberg College,* 621 F.2d 532, 535, 55 A.L.R. Fed. 806 (3d Cir. 1980) (independent levels of review and recommendation; board of trustees is vested with the power to grant tenure); *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 172-73 (1st Cir. 1978) (independent levels of review and recommendation, with board of trustees making final action in tenure decisions), *vacated and remanded,* 439 U.S. 24, 58 L. Ed. 2d 216, 99 S. Ct. 295 (1978), *aff'd,* 604 F.2d 106 (1st Cir. 1979), *cert. denied,* 444 U.S. 1045 (1980). In *Megill v. Board of Regents,* 541 F.2d 1073, 1078 (5th Cir. 1976), the court stated:

The exact position of the Board in this controversy should be noted. The Board was not sitting as a reviewing authority over a contest between the plaintiff and the president of the university. The Board's job was to grant or deny tenure. All of its proceedings were an attempt to give the plaintiff a full opportunity to prove his case for tenure and to prove that to deny him tenure would violate his First Amendment right to free speech.

In *Smith v. Greene,* 86 Wn.2d 363, 369, 371, 545 P.2d 550 (1976), under RCW 28B.50, the community college act, the board of a community college made the final decisions in granting tenure; the board was not bound by the recommendations of the review committee or officers below. *See generally* Special Comm. on

We now turn to the president's and Board's powers of review and the scope of their powers. Dr. Amoss contends that the president and the Board were not permitted to substitute their judgment for that of the fact–finding tenure committee, but were required to review the entire record and to uphold the tenure committee majority if they found substantial evidence in the record to support the majority's findings. Dr. Amoss contends that the president and the Board reviewed the record incompletely and that they exceeded their authority by failing to defer to the tenure committee's findings.

Faculty Code § 25–62(H)(1) states that the president's "review shall be based on the written briefs and/or oral argument, *as submitted by the parties* or their representatives, in their descretion [*sic*]." (Italics ours.) The Board's duty in reviewing the case is described in Faculty Code § 25–62(I)(1): "The Board shall receive written briefs or oral arguments, or both, *if tendered by the principals,* or their representatives . . ." (Italics ours.)

In Dr. Amoss' case, the president reviewed the parties' briefs, the attached exhibits, the reports of the majority and minority of the tenure committee, and the memoranda from Senior Assistant Attorney General Wilson. Dr. Amoss contends that the president failed to consider one–third of the exhibits in the record and that he was not aware of the omission because he never received that portion of the record. The president testified at his deposition that he did not review a recording or a transcript of the tenure committee hearing. Dr. Amoss states that she presumed the president would review the entire record, and in her brief, she urged him to review the record in an appellate manner, *i.e.*, to reverse only if he could not find substantial evidence in the record to support the committee's decision. Dr.

Educ. & Law of the Ass'n of Bar of City of New York, *Due Process in Decisions Relating to Tenure in Higher Education,* 11 J.C. & U. L. 323, 330 & n.33 (1984) (hereafter "*Due Process in Tenure*") (governing board of institution has ultimate authority to grant tenure).

Amoss made the same argument to the Board, as the Board received the briefs which were submitted to the president. The Board also reviewed the tenure committee majority and minority reports, the October 22, 1980 memo by Mr. Wilson, and the president's decision.

Dr. Amoss' contention that the president and Board have limited powers of review and should defer to the tenure committee's findings is premised on the assumption that the tenure committee vote is final. However, as we have described, it is the Board's decision that is final. Therefore, the president's and Board's scope of review is not limited in the manner described by Dr. Amoss. The extent to which agency heads are bound by findings at a hearing they did not attend is an issue that is not unique to universities and colleges but is common in the administrative decisionmaking process. Although the rules differ in each institution, agency heads are permitted to decide matters without hearing the testimony developed in a hearing before a fact–finding body below, unless the regulations direct them to defer to the fact–finding body. Agency heads who are responsible for making the ultimate decision typically rely on subordinates, including hearing examiners and fact–finding committees, to sift and analyze the evidence. "Somewhere along the line, however, the one in whose name the decision is rendered must personally address his mind to the evidence and argument and make the decision that he deems them to justify." B. Schwartz, *Administrative Law* § 7.20, at 392 (2d ed. 1984). "A deciding officer's failure to read the portions of the record cited in the exceptions is not a ground for reversal . . . so long as the officer sufficiently considers and appraises the evidence by other means." 3 K. Davis, *Administrative Law* § 17.3, at 284 (2d ed. 1980).

Amicus curiae for the American Association of University Professors, University of Washington Chapter (AAUPW), concedes that the Faculty Code grants to the administration the authority to override faculty determinations made at the departmental and tenure committee levels. The

AAUPW states that the president is the penultimate administrator and the Board of Regents is the ultimate administrative body, but the AAUPW contends that the Faculty Code does not supply any standard to measure such administrative overrulings. The AAUPW argues that due process requires some standards to limit the discretion of the president and the Board and urges this court to draw on national AAUP policy statements for these standards.

The references to the national AAUP's recommended regulations illuminate the fact that the University of Washington Faculty Code and governing statutes create a significantly different framework of decisionmaking. AAUP policy provides that on tenure matters the "governing board and president should . . . concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail." Statement of Principles on Academic Freedom and Tenure, *AAUP Policy Documents and Reports* 43 (3d ed. 1977). This policy, however, is not stated in the University rules and Faculty Code. On its face, the Faculty Code vests considerably greater discretion and decisionmaking authority in the president and the Board than does the AAUP policy. If the University wished to require the president and Board to defer to the tenure committee findings or to return a matter to the tenure committee for reconsideration when the higher officials disagree with the committee's findings, the University could so provide in its Faculty Code.

Nothing in the Faculty Code directs the president or the Board to review more than the briefs and documents submitted by the parties in their discretion. Dr. Amoss appended 11 exhibits to her brief, and she could have submitted more evidence. Dean Henley submitted 16 exhibits. In their briefs, the parties discussed the evidence in detail. Dr. Amoss could have submitted any additional portion of the record or the entire record had she wished to do so. We conclude that the president and the Board did review the case and that their consideration of the evidence conformed with the University regulations and was within their authority.

## Review of President's Findings and Conclusions

Since we have found that the president's decision was within his statutory authority, did not violate procedure, and was not affected by other error of law, RCW 28B.19-.150(6)(b)–(d), we now examine whether the president's findings and conclusions were clearly erroneous, arbitrary or capricious, or in violation of constitutional provisions. RCW 28B.19.150(6)(a), (e), (f). At the same time, we address the validity of the Board's decision, since the Board adopted the president's findings.

The president found that neither the decision of the dean nor that of the council was affected by sex discrimination and that the denial of tenure was based on Dr. Amoss' merits as a scholar, together with the legitimate needs of the college and the Department. The president did not accept the recommendation of the majority of the tenure committee; however, he did not explicitly reject the majority's findings regarding the existence of discrimination in the Department.

■ Discriminatory treatment normally is proven under the 3–step procedural test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. . . . Second, if the plaintiff has established a prima facie case, the burden of producing evidence shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff may offer evidence that the defendant's ostensibly legitimate reasons were not genuinely held but were merely a pretext for discrimination. While the *McDonnell Douglas* test does shift the burden of production once a plaintiff has offered a prima facie case, the burden of persuasion remains upon the plaintiff at all times. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Zahorik v. Cornell Univ.,* 729 F.2d 85, 92 (2d Cir. 1984).[5] A prima facie case of discrimination is established by evidence that the plaintiff was a member of the protected group, was qualified for tenure, and was not granted tenure in circumstances permitting an inference of discrimination. *Zahorik,* at 92. The ultimate factual inquiry is whether the defendant intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 75 L. Ed. 2d 403, 103 S. Ct. 1478 (1983).

In the present case, the majority of the tenure committee believed that Dr. Amoss was a victim of sex discrimination; however, the majority did not and could not find that she was qualified for tenure. The president upheld the dean's and council's determination that Dr. Amoss was not qualified for tenure and concluded, based on his evaluation of the evidence, that sex was not a motivating factor in that decision.

Our review of the record convinces us that the president's and the Board's findings were not clearly erroneous, arbitrary or capricious, or in violation of Dr. Amoss' constitutional rights. At the first level of decisionmaking, a majority of the Department faculty did vote in favor of granting Dr. Amoss tenure; however, the testimony is in dispute about

---

[5]In *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92 (2d Cir. 1984), the court noted that "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally. *Lieberman v. Gant,* 630 F.2d 60, 64 (2d Cir.1980)." The court listed the following factors: (1) Tenure contracts entail unusual commitments as to length of time and collegial relationships; (2) academic tenure decisions are often noncompetitive; (3) university tenure decisions are usually highly decentralized, although authority to overrule departmental decisions may exist since "the downside risk of affirmative decisions is greater than that of negative ones, but the deference given to departmental decisions grows as a case travels up the chain of authority"; (4) the number of factors considered in tenure decisions is quite extensive; and (5) tenure decisions are a source of unusually great disagreement.

While courts are reluctant to review the merits of a tenure decision, they have rejected the "hands off" approach to higher education Title 7 cases. T. Flygare, *Board of Trustees of Keene State College v. Sweeney,* 7 J.C. & U. L. 100, 107–08 (1980–81); *Powell v. Syracuse Univ.,* 580 F.2d 1150; 1153–54 (2d Cir.), *cert. denied,* 439 U.S. 984 (1978). *See generally Due Process in Tenure,* at 330–31.

the meaning of the discussion at the meeting. At the second level of decisionmaking, the council members who testified before the tenure committee stated that, in arriving at their decision, they read portions of Dr. Amoss' scholarly publications. The Code of Organizational Procedure of the College of Arts and Sciences, which clarifies standards and procedures the council members should use in tenure decisions, states that research and teaching are the main criteria for evaluation of tenure. Emphasis is to be placed on the quality of publication as a measurement of scholarly achievement. The council members testified that Dr. Amoss' publications did not meet the outstanding quality necessary to warrant granting tenure. A council member recalled that Dr. Amoss' teaching was concentrated in lower division courses. Thus, the council members who testified based their votes on Dr. Amoss' research and teaching. At the third step of decisionmaking, the dean stated that he formed his own opinion independent of the council's recommendation. The dean testified that he read Dr. Amoss' publications first and that his "opinion, based on the scholarly work, was negative."[6]

The University's procedures clearly enable the council and the dean to independently evaluate Dr. Amoss' record. The testimony and other evidence supports the council's and the dean's determination that Dr. Amoss' record lacked sufficient quality in research and teaching to

---

[6]We have considered Dr. Amoss' allegations that the dean's and council's decisions were negatively influenced by Dr. Dunnell's letter and by his attachment of letters from on–leave faculty. First, we recognize that Dr. Dunnell's letter was an important document in the tenure decision process. Indeed, the Ninth Circuit, in *Haimowitz v. University of Nev.*, 579 F.2d 526, 530 (9th Cir. 1978) and *Peacock v. Duval,* 694 F.2d 644, 647 n.3 (9th Cir. 1982) stated that "recommendations from department heads are usually of paramount importance." *Peacock,* at 647 n.3. In those cases, however, the amount of influence such recommendations had was a question of fact. In the present case, the president determined that whatever sex discrimination, if any, was embodied in Dr. Dunnell's letter did not influence the decision of the dean and the college council, and we do not find that the president's decision was arbitrary or capricious or based on clearly erroneous findings.

Second, the council members and Dean Henley testified that they gave little weight to the letters from on–leave faculty.

merit an award of tenure. Deficient scholarship is a legitimate, nondiscriminatory reason to deny tenure. *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981), *cert. denied,* 459 U.S. 823 (1982). In *Lieberman v. Gant,* 630 F.2d 60 (2d Cir. 1980), Dr. Lieberman claimed that the denial of her tenure was motivated by sex discrimination. The court determined that

> [t]here was overwhelming evidence that, whatever might be said of Dr. Lieberman's teaching, the participants in the tenure decision had ample basis for honest belief that her scholarship did not measure up to the properly stringent requirement for tenure.

(Footnote omitted.) *Lieberman,* at 66. Discussing comparative evidence offered by Dr. Lieberman, the court stated, "When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn." *Lieberman,* at 67. Similarly, in this case, even if Dr. Amoss did establish a prima facie case of sex discrimination, the president and the Board concluded that she did not prove that the college council's and dean's reasons for recommending denial of tenure were pretextual, masking an intent to discriminate. Thus, the president's and the Board's decisions were not in violation of Dr. Amoss' constitutional right to be free of discrimination.

■■ An agency's factual findings are clearly erroneous if the court, after reviewing all the evidence in the record, is left with the firm conviction that a mistake has been committed. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983).

> Administrative action is not arbitrary or capricious if there are grounds for two or more reasonable opinions and the agency reached its decision honestly and with due consideration of the relevant circumstances. Such action is not arbitrary or capricious merely because an

appellate court believes it would have reached a different decision on the same facts. *See, e.g., Barrie v. Kitsap County,* 93 Wn.2d 843, 850, 613 P.2d 1148 (1980). *Ritter v. Board of Comm'rs,* 96 Wn.2d 503, 515, 637 P.2d 940 (1981). In these circumstances, given the range of evidence, it is impossible for a reviewing court to find that the president's or the Board's decisions were clearly erroneous or arbitrary or capricious.

## EXCLUSION OF EVIDENCE AT TENURE COMMITTEE HEARING

Dr. Amoss contends that the chair of the tenure committee committed procedural error in excluding certain evidence and that, despite the tenure committee's majority vote in her favor, these procedural errors weakened her case on appeal to the president, the Board, and the court. The alleged errors were:

1. The chair denied Dr. Amoss the opportunity to present evidence that a male anthropology faculty member was treated differently and was granted tenure.

2. The chair rejected her attempt to introduce testimony that a female graduate student was subjected to stricter standards than a similarly situated male teaching assistant.

3. The chair would not permit Dr. Amoss' attorney to cross–examine Dr. Dunnell concerning his attitude toward another female faculty member.

None of these allegations of procedural error is sufficient to overcome the dean's and council's pre–tenure committee determinations that Dr. Amoss' record lacked sufficient quality to warrant tenure. Furthermore, in each instance, Dr. Amoss' attorney either abandoned the inquiry or failed to make an offer of proof sufficient to preserve the alleged error. The questions were exploratory in nature and the chair was acting within his discretion in disallowing the inquiries. Moreover, any error was harmless in light of the evidence that the decision to deny tenure was based on legitimate reasons made prior to the tenure committee hearing.

## APPEARANCE OF FAIRNESS

■ Dr. Amoss contends that the employment of two assistant attorneys general from the same office on the same case violates the appearance of fairness and the Code of Professional Responsibility, DR 5–105. However, in *State Med. Disciplinary Bd. v. Johnston,* 99 Wn.2d 466, 480–81, 663 P.2d 457 (1983), a plurality of the Supreme Court suggested that this practice may be proper:

> When the performance of any legal duties required of the Attorney General presents actual conflicts of interest, a different assistant attorney general can, and should, be assigned to handle those inconsistent functions. . . . [W]hen the dual roles of the Attorney General present such a conflict, two separate attorneys should handle those functions.

(Citation omitted.)

The University Division of the Attorney General's office properly assigned two separate attorneys to fulfill different functions. Senior Assistant Attorney General James Wilson acted as legal adviser to the president and the Board of Regents under RCW 28B.10.510, while, under the same statute, Assistant Attorney General Steve Milam represented the dean in the proceedings involving Dr. Amoss.[7] Mr. Wilson stated in affidavits that he did not confer with Mr. Milam about Dr. Amoss' appeal to the president, that he did not share advice or correspondence with Mr. Milam, and that the two attorneys kept separate files on the matter. These facts are not controverted. Accordingly, we find no actual impropriety or violation of the appearance of fairness doctrine.

## NONDISCLOSURE OF WILSON MEMORANDA

In his capacity as legal adviser to the president, Mr. Wilson prepared two memoranda concerning Dr. Amoss' appeal. The first, dated October 22, 1980, is an extensive

---

[7]RCW 28B.10.510 provides:

"The attorney general of the state shall be the legal advisor to the presidents and the boards of regents and trustees of the institutions of higher education and he shall institute and prosecute or defend all suits in behalf of the same."

memorandum digesting the evidence and outlining the options available to the president. During review of the case by the Superior Court, Dr. Amoss moved for disclosure of the Wilson memoranda. On February 19, 1982, after inspecting the memoranda in camera, the court denied Dr. Amoss' motion to compel production of these documents. The court ruled that the memoranda were protected by the attorney–client privilege and that the privilege had not been waived.

The attorney–client privilege, RCW 5.60.060(2), applies to confidential communications for advice between attorney and client during the course of the attorney's professional employment and extends to written communications from an attorney to his client. *Kammerer v. Western Gear Corp.*, 96 Wn.2d 416, 421, 635 P.2d 708 (1981) (citing *Victor v. Fanning Starkey Co.*, 4 Wn. App. 920, 486 P.2d 323 (1971)). The privilege is not absolute but must be limited to its central purpose of encouraging free and open communication between attorney and client without fear of disclosure. *State v. Chervenell*, 99 Wn.2d 309, 316, 662 P.2d 836 (1983).

Courts have refused to invalidate agency decisions because of help by review attorneys who prepared digests of the record, memoranda, or proposed findings and decisions. B. Schwartz, *Administrative Law* § 7.24, at 410 (2d ed. 1984); 3 K. Davis, *Administrative Law* § 17.10, at 310–11 (2d ed. 1980). Disclosure of such internal memoranda is generally not compelled. Schwartz § 7.24, at 411.

Once a party claims that the attorney–client privilege applies, "the *trial judge determines* whether the facts justify the allowance of the claim." (Footnote omitted.) 8 J. Wigmore, *Evidence* § 2322, at 630 (rev. 1961). The trial judge in this case determined that the memoranda reflected legal advice confidentially conveyed by Mr. Wilson to President Gerberding and the Board. Mr. Wilson's memoranda were based solely on facts which were in the record, the briefs, and the exhibits, and were available to Dr. Amoss during the proceedings. Presumably weighing the need to

preserve attorney–client confidentiality against Dr. Amoss' need for disclosure under the discovery rules, the judge decided that the memoranda should not be produced. In these circumstances, we cannot find that the judge erred. Moreover, the nondisclosure did not prejudice Dr. Amoss since she had access to all the facts in Mr. Wilson's memoranda, and the reviewing courts could base their decisions on the full administrative record. *See Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419–20, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971).

### Peremptory Challenge

Dr. Amoss finally contends that the tenure committee should have allowed her to exercise a peremptory challenge on the third day before the hearing began. Faculty Code § 25–62(F)(1)(c) gives each party the right to disqualify up to 2 members of the 5–member tenure committee by peremptory challenge. A challenge must be made in writing at least 3 days before the hearing is to begin. On March 31, 1980, Dr. Amoss accepted the committee "as constituted," including the one alternate who was listed, Professor Paul Waibler; however, she requested that she be notified as soon as possible if Mr. Milam, who was representing Dean Henley, exercised a challenge to the committee. About 1 week before the hearing, Mr. Milam challenged one member of the committee. On May 14, 1980, 3 days before the day the hearing began, Dr. Amoss challenged the new committee member, Professor Waibler. The chair of the tenure committee denied Dr. Amoss' peremptory challenge because she originally had not objected, and "we are too near to the hearing date to make a change." Ultimately, Professor Waibler was one of the two dissenting members of the committee.

In these circumstances, where Dr. Amoss did not challenge Professor Waibler, despite the fact that 2 months earlier she had been notified of Professor Waibler's alternate status, the tenure committee chair had the discretion to deny her peremptory challenge. More importantly, our

disposition of this case rests on the propriety of the dean's and the council's decisions regarding Dr. Amoss' candidacy for tenure, and on the president's and the Board's ability to independently review and concur with those decisions. Any error in the tenure committee chair's refusal to allow Dr. Amoss' challenge did not affect the dean's or the council's independent judgments which preceded the hearing.

For all the foregoing reasons, we affirm the order of the Superior Court.

SCHOLFIELD, A.C.J., and RINGOLD, J., concur.