737 P.2d 1099

**Denny CARLEY, Plaintiff-Appellant,**

v.

**ARIZONA BOARD OF REGENTS and Eugene M. Hughes, President of Northern Arizona University, Defendants-Appellees.**

**No. 1 CA–CIV 8873.**

Court of Appeals of Arizona, Division 1, Department D.

Feb. 26, 1987.

Review Denied May 27, 1987.

Bendheim & Mote, P.C. by Theodore D. Mote, Phoenix, for plaintiff-appellant.

Mangum, Wall, Stoops & Warden by A. Dean Pickett, Flagstaff, for defendants-appellees.

## OPINION

EUBANK, Presiding Judge.

This appeal is from a superior court judgment affirming a decision of Northern Arizona University President Eugene M. Hughes to deny the renewal of a teaching contract to the appellant Denny Carley. Carley raises the following issues on appeal: (1) whether his right to academic freedom was violated because student evaluations were utilized as the primary tool to determine his teaching effectiveness, (2) whether President Hughes abused his discretion by rejecting the findings of the majority of the Academic Freedom and Tenure Committee and (3) whether there was substantial evidence to support the President's decision. We find no infringement upon Carley's right to academic freedom and further find that President Hughes' decision was not an abuse of discretion and is supported by the record.

## FACTS

In 1983–84 Carley was in his fifth year as an untenured assistant professor of art at Northern Arizona University (NAU). The Art Department Committee on Faculty Status reviewed material supplied by Carley in support of his request for continued retention and in addition considered several years of student evaluations. By a three-to-two vote, the committee recommended that Carley not be retained as a faculty member.

In accordance with university policies, the Art Department chairman, Dr. Don Bendel, reviewed the committee's recommendation and made his recommendation to Dr. Charles Aurand, Dean of the College of Creative Arts. Dr. Bendel disagreed with the committee and recommended that Carley be retained. Dr. Aurand then made a recommendation that Carley not be retained to Dr. Joseph W. Cox, Vice-President for Academic Affairs. Dr. Cox in turn recommended that President Hughes uphold the recommendations of the Art Department Committee on Faculty Status and Dean Aurand not to retain Carley. On May 29, 1984, President Hughes concurred in the recommendations for non-retention and informed Carley that he was being offered a terminal contract for the 1984–85 academic year.

Carley requested that Dr. Hughes review his decision. He was subsequently informed that Dr. Hughes had made his review and reaffirmed his original decision. Carley then appealed Dr. Hughes' decision to the NAU Committee on Academic Freedom and Tenure alleging violations of his constitutional rights to freedom of speech, press, association, academic freedom and substantive due process.

The Academic Freedom and Tenure Committee met on February 2 and 3, 1985, and by a six-to-three vote found that Carley's rights to academic freedom and due process had been violated and recommended that he be retained in his position at NAU. Both the majority and minority reports of the committee were submitted to President Hughes. President Hughes reviewed these reports and in addition considered a legal opinion from the Board of Regents' counsel, memoranda from counsel for NAU and counsel for Carley, and a transcript of Carley's hearing before the Committee on Academic Freedom and Tenure. He adopted the findings of the minority report and again reaffirmed his decision that Carley's contract for 1984–85 was a terminal contract.

Carley filed a complaint in superior court pursuant to A.R.S. § 12–901 et seq., the Administrative Review Act. The superior court upheld the administrative decision and Carley filed a notice of appeal to this court.

## SCOPE OF REVIEW

Pursuant to A.R.S. § 12–901 et seq., the trial court's review of President Hughes' decision was limited to determining whether he acted arbitrarily, capriciously or in abuse of his discretion. DeGroot v. Arizona Racing Comm'n, 141 Ariz. 331, 686 P.2d 1301 (App.1984); Schmitz v. Arizona State Board of Dental Examiners, 141 Ariz. 37, 684 P.2d 918 (App.1984). On appeal this court must determine whether the record contains evidence to support the tri-

al court's judgment and, in so doing, reach the underlying question of whether President Hughes acted arbitrarily, capriciously, or in abuse of his discretion. *Maricopa County v. Gottsponer,* 150 Ariz. 367, 723 P.2d 716 (App.1986). In the resolution of factual issues, this standard requires us to determine whether there was substantial evidence to support the decision. *Webster v. State Board of Regents,* 123 Ariz. 363, 599 P.2d 816 (App.1979). If two inconsistent factual conclusions could be supported by the record, then there is substantial evidence to support an administrative decision that elects either conclusion. *Id.*

However, both the trial court and this court are free to draw their own legal conclusions and decide whether an agency erred in its determination of the law. *Arizona Department of Economic Security v. Magma Copper Co.,* 125 Ariz. 23, 607 P.2d 6 (1980); *Eshelman v. Blubaum,* 114 Ariz. 376, 560 P.2d 1283 (App.1977). We may substitute our judgment for administrative conclusions regarding the legal effect of its factual findings. *Gardiner v. Arizona Department of Economic Security,* 127 Ariz. 603, 623 P.2d 33 (App.1981). Therefore, we may decide independently whether the utilization of student evaluation forms critical of Carley's teaching methods as a basis for nonrenewal violated Carley's first amendment rights as a matter of law.

### ACADEMIC FREEDOM

■ Carley's basic premise is that he was engaged in a constitutionally protected activity and that this activity was a motivating factor in the university's decision not to rehire him. He contends that the university must show that he would have been terminated notwithstanding the protected activity, citing *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The activities which Carley identifies as "protected speech" are his teaching methods. He characterizes himself as being a "demanding teacher contrary to some student expectations" and represents one of his teaching methods as frequently leaving his classes unattended during appointed meeting times in order to teach students to be more self-reliant. He further describes his methods as emphasizing independent student work in order to reflect the expectations which students will encounter in the business world. Carley contends that, because student evaluations were critical of those methods, the students are challenging his exercise of academic freedom. Thus, he concludes that the student evaluations cannot be used as the primary basis for failing to renew his contract because they infringe on a protected activity.

Carley cites several cases in support of his contention that teaching methodology is part of his "academic freedom" right. However, our review of the cases indicates that each involved conduct closely identified with speech content rather than teaching methods.

For example, Carley relies on *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), in which the court was dealing with a New York law under which the "utterance of any treasonable or seditious word or words ..." was grounds for dismissal, as well as questions of Communist Party membership. Similarly, in *State Board for Community Colleges and Occupational Education v. Olson,* 687 P.2d 429 (Colo.1984), also cited by Carley, the court stated that the "principle [of academic freedom] finds its source in the belief that teachers should be free to engage in the exchange of *diverse ideas on controversial topics....*" 687 P.2d at 437. (Emphasis added.) *Olson* involved the cancellation of a student newspaper, finding that such closure did *not* "abridge the constitutionally protected aspect of [her] teaching function." She was still free to utilize other means for "presentation of the idea-content of her journalism courses...." 687 P.2d at 438.

In *Kingsville Independent School District v. Cooper,* 611 F.2d 1109 (5th Cir. 1980), also cited by Carley, the court considered a history teacher's presentation of post-Civil War Reconstruction history through a role-playing technique which

**464**

evoked strong student feelings on racial issues. The school board declined to renew her teaching contract because there had been parent complaints about this teaching method. Again, like *Keyishian* and *Olson*, the case involved the discussion of controversial topics and the presentation of controversial course materials. The court found that the speech was protected and could not be used as a basis for non-renewal unless the classroom discussions "clearly over-balance[d] [her] usefulness as an instructor...." 611 F.2d at 1113, citing *Kaprelian v. Texas Women's University,* 509 F.2d 133, 139 (5th Cir.1975). In neither *Keyishian, Olson* nor *Cooper* was termination or nonrenewal of employment based only upon classroom teaching techniques. Speech content was clearly at issue. Unlike those cases, specific communications are not at issue here.

Various courts have expressed their reticence to intervene in academic decision making by a university concerning retention of teaching personnel. This reluctance is based on the belief that such decisions are best made by those who have expertise in education. *See, e.g., Beitzell v. Jeffrey,* 643 F.2d 870, 875 (1st Cir.1981); *Clark v. Whiting,* 607 F.2d 634, 639–40 (4th Cir. 1979); *Derrickson v. Board of Education,* 537 F.Supp. 338, 343 (E.D.Mo.1982). *See generally* W. Kaplin, *The Law of Higher Education* § 3.6.2 (2d ed. 1985).

Challenges to institutional decisions to deny tenure to faculty for reasons relating to teaching methods, course content and grading policies have been notably unsuccessful. For example, in *Hetrick v. Martin,* 480 F.2d 705 (6th Cir.1973), a state university declined to renew the appointment of a nontenured faculty member because of disapproval of her "pedagogical attitude," as evidenced by teaching styles and techniques. The court expressly refused to recognize teaching methods as protected speech, holding:

> Whatever may be the ultimate scope of the amorphous 'academic freedom' guarantee to our nation's teachers and students ..., it does not encompass the right of a nontenured teacher to have her teaching style insulated from review by

her superiors when they determine whether she has merited tenured status ...

480 F.2d at 709.

Similarly, in *Clark v. Holmes,* 474 F.2d 928 (7th Cir.1972), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973), the court upheld the nonrenewal of a nontenured instructor for reasons related to the structure of his course content. The court stated "we do not conceive academic freedom to be a license for uncontrolled expression at variance with established curricular contents and internally destructive of the proper functioning of the institution." 474 F.2d at 931.

In *Lovelace v. Southeastern Massachusetts University,* 793 F.2d 419 (1st Cir. 1986), a faculty member contended that his right of academic freedom was violated when he was denied tenure because he refused to lower his standards and change his grading policies. Student complaints concerning his policies were considered by the university. The court held that, even if he were fired for refusing to lower his standards, he failed to state a constitutional claim. 793 F.2d at 425. Finding that the first amendment does not require that a teacher be made a sovereign to himself, the court held that the university, not the individual faculty member, had the right to set policy on course content, homework load and grading policy. 793 F.2d at 426. The court particularly noted that the teacher was not denied employment for voicing an opinion concerning these policies, but for refusing to comply with existing policies. 793 F.2d at 425. This was distinguishable from a protected speech claim.

Other cases holding that "teaching methods" do not generally fall under the rubric of academic freedom include: *Millikan v. Board of Directors of Everett School District No. 2,* 93 Wash.2d 522, 611 P.2d 414 (1980); *Adams v. Campbell County School District,* 511 F.2d 1242 (10th Cir. 1975); *Riggin v. Board of Trustees of Ball State University,* 489 N.E.2d 616, 629–30 (Ind.App.1986).

The Supreme Court recently spoke on the issue of academic freedom in *Regents of*

*the University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). While student retention rather than teacher retention was at issue, the principles set forth are applicable to both situations. After noting its reluctance to encroach on the prerogatives of educational institutions and its commitment to the academic freedom of those institutions, the court commented in footnote 12:

> Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students [citations omitted], but also, and somewhat inconsistently, on *autonomous decision making by the academy itself* [citations omitted]. Discretion to determine, on academic grounds, who may be admitted to study, has been described as one of "the four essential freedoms" of a university. (Emphasis added.)

474 U.S. at 226, 106 S.Ct. at 514, 88 L.Ed.2d at 533.

*Sweezy v. New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), cited in *Ewing,* expressly includes among the "four essential freedoms of the university," the freedom "to determine for itself on academic grounds who may teach...." 354 U.S. at 263, 77 S.Ct. at 1218, 1 L.Ed.2d at 1332.

The record is clear that Carley was not denied a contract because of expressing unpopular opinions or otherwise presenting controversial ideas to his students. Rather, the University concluded that he was not an effective teacher. It was apparently their professional opinion that his methodology was not successful. Academic freedom is not a doctrine to insulate a teacher from evaluation by the institution that employs him. Thus, we conclude that the decision not to retain Carley, even if based, in part, upon student evaluations expressing disapproval of his teaching methods, did not violate his first amendment rights.

## PRESIDENT HUGHES' REJECTION OF THE MAJORITY REPORT OF THE NAU ACADEMIC FREEDOM AND TENURE COMMITTEE

■ Carley contends that while President Hughes was not bound to follow the recommendation of the Academic Freedom and Tenure Committee in making his final decision, he was nevertheless bound by the committee's "evidentiary" factual findings and could not disregard those findings or substitute his own. In support of this contention, Carley cites *Fulton v. Dysart Unified School District No. 89,* 133 Ariz. 314, 651 P.2d 369 (App.1982); *Knollmiller v. Welch,* 128 Ariz. 34, 623 P.2d 823 (App. 1980); and *Blair v. Lovett,* 196 Colo. 118, 582 P.2d 668 (1978).

In *Fulton v. Dysart Unified School District No. 89, supra,* this court reviewed the decision of a school district board operating under a statutory scheme whereby the board was limited to basing its decision on factual findings made by a commission. This court concluded that the Arizona statutes in question did not authorize a school board to conduct a second full review of the evidence or to adopt new findings of fact. Rather, it was free to make the ultimate decision based on the factual findings before it or to remand to the commission for additional findings if it felt those findings were insufficient upon which to base a decision. 133 Ariz. at 317, 651 P.2d at 372. The same statutory scheme was considered in *Knollmiller v. Welch, supra,* and a similar statutory scheme was at issue in *Blair v. Lovett, supra.* In contrast to these cases, the president of NAU was not constrained to accept the factual findings of the Academic Freedom and Tenure Committee.

The Conditions of Faculty Service adopted by the Arizona Board of Regents in effect at times pertinent to this appeal provided:

> H. Promotion and Tenure
>
> 1. ... The final decisions on promotion, tenure and retention shall be made by the university president *after considering all evaluations, recommendations and other evidence submitted.* (Emphasis added.)

Thus, President Hughes was free to consider the factual findings made by the minority members of the committee and any oth-

er evidence which he found relevant to his decision.

In *Amoss v. University of Washington,* 40 Wash.App. 666, 700 P.2d 350 (1985), the Washington Court of Appeals was faced with a situation analogous to the instant case. A University of Washington faculty member submitted a complaint to that institution's tenure committee, which under the faculty code had responsibility for determining whether denial of tenure was based upon discrimination. Although the committee could render a decision, the president of the university had full power under the faculty code to reverse the committee's decision. The professor received a favorable decision from the tenure committee which found that discrimination had occurred. However, this finding was not adopted by the president or the board of regents. The Washington Court of Appeals rejected a claim that the finding of the committee should be followed by the president, holding:

> If the University wished to require the President and Board to defer to the tenure committee findings or to return a matter to the tenure committee for reconsideration when the higher officials disagreed with the committee's finding, the University could so provide in its faculty code....
>
> In the present case, the majority of the tenure committee believed that Dr. Amoss was a victim of sex discrimination; however, the majority did not and could not find that she was qualified for tenure. The President upheld the Dean's and council's determination that Dr. Amoss was not qualified for tenure and concluded, based on his evaluation of the evidence, that sex was not a motivating factor in that decision.

40 Wash.App. at 674–677, 700 P.2d at 358–361. The court upheld the president's decision. *See also Remsen v. University of Florida,* 429 So.2d 1228, 1229 (Fla.App. 1983).

Carley has pointed to no statutory requirement or regulation of the Arizona Board of Regents that would limit President Hughes to basing his decision upon the facts found by the majority of the Committee on Academic Freedom and Tenure. We have found no such authority. Accordingly, we find no abuse of discretion by President Hughes in rejecting the findings of the majority report.

## WAS PRESIDENT HUGHES' DECISION ARBITRARY AND CAPRICIOUS OR IN ABUSE OF HIS DISCRETION?

■ Initially, we note that Carley argues that the factual findings of the majority report of the Academic Freedom and Tenure Committee were supported by competent evidence. However, that committee's decision is not at issue. Rather, we must decide whether President Hughes' decision was supported by substantial evidence. As previously discussed, if the inconsistent conclusions of the various committees and administrators can be supported by the record, there is substantial evidence to support the final administrative decision that elects either conclusion. *Webster v. State Board of Regents,* 123 Ariz. at 365–66, 599 P.2d at 818–19.

The student comments that were considered by the Art Department Committee on Faculty Status were also in the record reviewed by Dr. Hughes. These statements contain predominantly negative criticisms that appear consistent over a period of several years. The record clearly reflects that, at all levels of the decision-making process, negative student evaluations both in terms of comments and numerical evaluations were of primary importance in the decision against retaining Carley. The following testimony of Dr. Aurand, Dean of the College of Creative Arts, summarizes the kind of information given to President Hughes throughout the process:

> Q. BY MR. PICKETT: Going then, as the committee has, to your conference with Dr. Cox could you elaborate a bit more on what you shared with him?
>
> A. I shared essentially the form you see before you in terms of the student evaluations where we have that longitudinal look. I shared with him the peer evaluation information, I shared with him the self-evaluation, the personnel

file, the kinds of exhibits, the kind of work that he has been doing in a professional way. I shared with him the recommendations.

\* \* \* \* \* \*

Q. Can you summarize your recommendation to Dr. Cox that Mr. Carley not be retained?

A. In summary I would have to say it was the result of the longitudinal look at this man's career since he has been at NAU with the primary indicators being the student evaluations and lack of significant progress in that area. The student comments that came along with that. The total ranking that I have had to work with in terms of the last three or four years in his relative position.

Q. The total ranking, you mean student, peer, self and chair?

A. Absolutely. All elements.

Carley has contended it was wrong to evaluate his teaching effectiveness primarily by student evaluations. The use of student evaluations as a consideration in assessing teaching fitness has been upheld without discussion in a number of cases. *See, e.g., Lovelace v. Southeastern Massachusetts University,* 793 F.2d at 425–26; *Dyson v. Lavery,* 417 F.Supp. 103, 111 (E.D.Va.1976); *Lieberman v. Gant,* 474 F.Supp. 848, 866 (D.Conn.1979); *Peters v. Middlebury College,* 409 F.Supp. 857, 867 (D.Vt.1976). Carley has cited no authority that relying *primarily* or *solely* on student evaluations would be impermissible. We have found none.

Based on our review of the record, including student evaluations, we find substantial evidence to support President Hughes' decision.

The record in this matter shows that President Hughes relied on a committee decision of Carley's own peers that he should not be renewed and similar recommendations from the dean of his college and the vice-president for academic affairs. Further, President Hughes reviewed his original decision at Carley's request. He also reviewed the factual findings of the majority and minority of the Committee on Academic Freedom and Tenure, the transcript of the hearing, and sought input from counsel for both parties and independent counsel. The record demonstrates diligence in reaching what appears to have been a difficult decision. It is precisely this type of decision which is best left to the academic community rather than to a court.

We find that President Hughes did not act in an arbitrary or capricious manner nor in abuse of his discretion. We therefore affirm the decision of the trial court.

### ATTORNEYS' FEES

█ Both parties have asked for an award of attorneys' fees based on A.R.S. § 12–341.01 and Rule 21(c), Arizona Rules of Civil Appellate Procedure. Apparently, it is undisputed that this matter arose out of contract and that it is within the discretion of this court to award fees to the prevailing party. In the exercise of our discretion, we award attorneys' fees to the Arizona Board of Regents and President Hughes in an amount to be determined following submission of a statement of costs in accordance with Rule 21(c) and this court's opinion in *Schweiger v. China Doll,* 138 Ariz. 183, 673 P.2d 927 (App.1983).

GRANT and HAIRE, JJ., concur.