**Richard K. HILLIS, Plaintiff-Appellee Cross-Appellant,**

v.

**STEPHEN F. AUSTIN STATE UNIVERSITY, et al., Defendants-Appellants Cross-Appellees.**

No. 80–1570.

United States Court of Appeals, Fifth Circuit.*
Unit A

Jan. 11, 1982.
Rehearing and Rehearing En Banc Denied Feb. 4, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Gregory Wilson, Richard Arnett, Asst. Attys. Gen., Austin, Tex., Robert Provan, Gen. Counsel, Nacogdoches, Tex., for defendants-appellants cross-appellees.

Martha McCabe, Tyler, Tex., Thomas J. Griffith, Lubbock, Tex., for plaintiff-appellee cross-appellant.

Before CHARLES CLARK, TATE and SAM D. JOHNSON, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The defendants in this section 1983 action, Stephen F. Austin University (SFA) and Dr. Creighton Delaney, appeal the district court's decision, 486 F.Supp. 663 (E.D. Tex.1980), concerning the non-renewal of employment of Richard Hillis, a nontenured art professor. The district court found that Hillis' nonrenewal was constitutionally impermissible and ordered reinstatement with backpay against SFA and Delaney jointly and severally. Because the court was clearly erroneous in its factual first amendment findings under *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977) we reverse.[1]

Dr. Hillis began teaching at SFA in the fall of 1974. Shortly after the term began he received a note from the head of the Art Department, Dr. Creighton Delaney, instructing him to carry a student, Kelly Perkins, for advanced placement on his class roll in Art 300, and to give her a "B" for the course. Despite Hillis' reservations concerning this matter there was no discussion of it between him and Delaney until sometime in December.

SFA had no specific written policy which authorized Delaney to give an advance placement grade for Art 300. Delaney insists he was acting pursuant to established SFA policy in acting as he did. Hillis states he knew of no such policy and thought it a violation of his academic freedom for Delaney to insist he give a grade to a student whose work he had not reviewed. Our resolution of this case does not hinge on resolving the parties' dispute over whether an advanced placement policy existed at SFA, because the record demonstrates Hillis' claim of academic freedom based on the grading incident lacks merit. The district court found that the December discussion became a heated debate, which solidified a rift between the two educators. Whatever might have been the true substance of this meeting, in its aftermath Hillis gave Ms. Perkins a "grade withheld," and not a "B". Several weeks later, Hillis returned from a conference in Washington to find that Delaney had reassigned him for the spring semester from a graduate research course to a freshman design course. Hillis protested the reassignment in a February 4, 1975 meeting with Delaney at which Dr. Rodewald, an American Association of University Professors (AAUP) member was present. At this meeting, Delaney cited the earlier grading incident as an example of Hillis' lack of cooperation. The mention of the grade incident prompted Hillis to discover at the registrar's office that Delaney had changed the "grade withheld" to a "B". The next day, Hillis received a letter informing him his contract would not be renewed. Various forms of further protests by Hillis ensued, but are irrelevant in the sense that they could not have formed the basis for Hillis' nonrenewal.

The district court found that Hillis engaged in a number of protected activities, first and foremost being his meeting with Delaney concerning the Perkins grade, and his criticism of the directive. Also found to be among his protected activities was an appeal to the AAUP for representation and relief in the matter of the reassignment, the grading incident, and his protests about these matters. The district court correctly stated the pertinent law: a teacher does not surrender constitutionally protected rights of freedom of expression as a condition of public employment, *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). It is also correct that Hillis' alleged criticism of Delaney did not *per se* lose its protection merely because it was private expression directed at his superior. *Givhan v. Western Line Consolidated Independent School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97,

---

1. Our determination that the district court erred in its findings of fact makes unnecessary any analysis of the eleventh amendment contention raised by plaintiff. The district court's eleventh amendment analysis is discussed, however, in *United Carolina Bank v. Board of Regents, Stephen F. Austin State University*, 665 F.2d 553 (5th Cir. 1981).

58 L.Ed.2d 619 (1979). However, the record does not support the court's findings of fact under *Mt. Healthy*, 429 U.S. at 285–87, 97 S.Ct. at 575–76, concerning whether, when, and how Hillis engaged in these "protected activities," whether this motivated his nonrenewal, and whether he would not have been renewed regardless of them.

The district court found that Hillis' nonrenewal was substantially motivated by his exercise of first amendment rights. According to the court, this finding was based largely on "Delaney's testimony" that the "Perkins incident was not 'insubstantial' in his decision to recommend nonrenewal." In fact, Delaney did not testify to that effect, rather, the statement was attributed to him by Dean Turner. More significantly, testimony that the "*incident*" was a factor was translated by the court into a finding that Hillis' *criticism* of Delaney's action and SFA policy was a substantial factor in his nonrenewal. This mistake in assessing the proof led to reversible error.

The Perkins incident unquestionably involved plain insubordination as one component, and arguably included Hillis' first amendment-protected criticism as another. However, the plaintiff's own testimony undercuts the court's finding that the Perkins incident involved the type of criticism which could have been a substantial factor in his nonrenewal. Neither Hillis nor Delaney testified that the December discussion of the grading matter became a heated debate. Rather, Hillis testified that the discussion culminated in an agreement on how to resolve the situation.[2]

Hillis testified that he did not protest the grading incident until after the February 4th meeting concerning his reassignment,[3] and therefore the only fair reading of his testimony is that he did not engage in substantial first amendment activity until the February protests. Thus, the testimony by Delaney and Turner that the Perkins "incident" played a substantial part in Hillis' nonrenewal discussion could refer only to the lack of cooperation displayed by Hillis with regard to Delaney's instructions and what Delaney thought was a violation of SFA policy. The timing of relevant events as well as their content demonstrate the testimony could not have referred to Hillis' exercise of any constitutionally protected right to protest or criticize. This did not occur until later.

The district court rejected Delaney's testimony that the decision to not renew Hillis had been made in December, and had been based only on Hillis' lack of cooperation and abrasiveness. The court rejected the testimony as uncorroborated, and possibly fabricated. However, Delaney's testimony about the timing of the decision to not renew Hillis and the reasons therefor, was corroborated in full by the Dean of the Fine Arts School, Dr. Turner.[4] A review of

---

**2.** Hillis testified that Delaney agreed to have Ms. Perkins submit her portfolio to Hillis for review, prior to entry by Hillis of the "B" grade. If this was Hillis' understanding of their discussion, it is logical that he made no protest over Delaney's actions until February when he discovered that Delaney breached this "agreement." Whether Hillis' recollection of the December conversation is accurate is unimportant. At the least, in his own mind there was an agreement with Delaney, and therefore no protest was made until weeks later.

**3.** His testimony was: "When I went to talk to Dr. Delaney [in February 1975] about being removed from this class . . . I don't think I was protesting the grade business to him at that time, because I don't think I knew that he had changed the grade yet. When he cited the grade as an example of my lack of cooperation . . . that's when I went to the Registrar's Office

and checked on the grade and found out it had been changed to a B. *So, initially, I only protested the removal from the class to Dr. Delaney,* but I protested the removal from the class and the grade change to Dr. Turner, Dr. Lewis and Dr. Steen."

**4.** Indeed, Dr. Turner responding to a question by the court affirmed that the primary reason Delaney gave in recommending Hillis' nonrenewal was general lack of cooperation based on several listed specific instances of conduct in addition to the advanced placement incident. Yet, the trial judge apparently discredited most, if not all, of Delaney's testimony. The court found it "ironic" that Delaney, who offered so much testimony about Hillis' misconduct was the person who recommended his nonrenewal. It is not ironic that Delaney recommended nonrenewal—it is logical. Delaney was Hillis' immediate superior, the man re-

the record leaves us with the definite and firm conviction that the district court made a mistake in finding that any exercise of Hillis' first amendment rights was a substantial motivating factor in the nonrenewal decision. *In re Multiponics, Inc.*, 622 F.2d 709, 723 (5th Cir. 1980). The trial court's findings, based on statements attributed to the wrong persons and on obvious oversights of important corroborating testimony, are not supported by the record. This is not a case where the reviewing court would have found otherwise. Rather, it is a case where the trial court could not permissibly have found as it did. *Movible Offshore, Inc. v. The M/V Wilken A. Falgout*, 471 F.2d 268, 271 (5th Cir. 1973).

■ Even if we were to assume that Hillis did exercise his first amendment rights and that his nonrenewal was predicated on that activity, the district court was clearly erroneous in its factual findings under the second prong of *Mt. Healthy*. The defendants did show by a clear preponderance of the evidence that Hillis would not have been renewed in any event.

The district court stated that other than the grading incident the only evidence with respect to Dr. Hillis' conduct concerned his acquisition of a projector light bulb in a manner contrary to university procedures. The court found that nonrenewal would not have occurred as a result of this one incident. Hillis brought a projector bulb from a local store for use in his own projector, and presented the bill to the secretary of the art department. Delaney testified that Hillis had been instructed to follow normal university requisition procedures, and that this method was not in accord with those procedures. Assuming this to be so, Hillis' actions in flaunting proper procedures furnished another example of his lack of cooperation. More important, however, is the related testimony of Ann Turner, art department secretary, that Hillis flew into a rage as she attempted to explain proper

requisition procedures to him. Ms. Turner testified that Hillis' manner was abusive and that he used filthy language in her presence. Moreover, Ms. Turner stated that Hillis behaved toward her in this manner not just during the "light bulb" incident, but several other times as well. Hillis' abusive, ill-mannered behavior towards a staff member was made known to Dr. Delaney and Dean Turner. This record simply will not permit a facile conclusion that the "light bulb" incident with its explanatory testimony could not establish that Hillis' employment would not have been renewed regardless of his alleged first amendment activities.

The district court was also clearly erroneous in finding this to be the only other proof of Hillis' unsatisfactory conduct. Delaney testified that on one occasion, Hillis refused to fill out Government W–2 forms saying it was "nonsense" to have to do so. On another occasion Hillis complained about not being able to locate blueprint paper in Nacogdoches. Delaney found a source for the paper in Lufkin, and Hillis agreed to pick it up during a trip there. Hillis neglected, however, to pick it up, and thereafter persisted in complaining to Delaney's secretary about not having it. Finally, Delaney himself drove to Lufkin and picked up the paper. He then noticed that Hillis did not use it for several weeks thereafter. Another example of uncooperative, abusive conduct by Hillis was given by Diane Ford, a library staff person, who testified that Hillis shouted criticism of the graduate program and its students at her in the presence of several students. In Hillis' supplemental reply brief he seeks to belittle Ms. Ford's testimony because of her lack of knowledge in art. But, it was completely permissible for the officials at SFA to conclude that the state of Ms. Ford's erudition should not insulate Hillis from the consequences of his rudeness to her. Delaney also testified that even after being notified of his reassignment Hillis persisted in at-

___

quired to be aware of Hillis' performance, and the man responsible for evaluating it. This is the case in most if not all institutional organizations. Moreover, the record contains much

probative testimony by witnesses other than Delaney which the trial court for all practical purposes ignored.

tending the class from which he had been transferred. Delaney, who had himself taken over the class, was thus put in the awkward position of having to ask Hillis to leave in the presence of the students assembled. A January 20 memorandum from Delaney to Dean Turner describing Hillis' lack of cooperation, abrasiveness and abusiveness offers further corroboration. It shows that in the context of what was known to Delaney and Dean Turner when the decision was made not to renew Hillis' employment, the Perkins grading incident was just one other example of unsatisfactory demeanor and attitude on the part of a probationary employee. The preponderance of the evidence showed clearly that Hillis would not have been renewed regardless of his later first amendment activity.

In sum, the facts of this case and their misapplication by the district court, reflect the concerns voiced by Justice Rehnquist in *Mt. Healthy*:

A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

429 U.S. at 286, 97 S.Ct. at 575. Hillis' nonrenewal was clearly based on his continual lack of cooperation and unacceptable conduct, of which the grading incident was just one example. Hillis' subsequent protests did not prevent his employer from implementing the decision not to renew his employment contract.

The district court's decision was grounded solely on the *Mt. Healthy* first amendment analysis. Little mention was made of Hillis' fourteenth amendment due process claims or his asserted rights of academic freedom based in part on the first and ninth amendments. Although Hillis did not specifically assign these omissions by the dis-

trict court as error, he urges this court to consider them on appeal. We do and find both lacking in merit.

As a nontenured teacher Hillis' continued employment was expressly contingent on satisfactory professional performance. He had no legitimate claim of entitlement to or property right in continued employment. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). His unsatisfactory professional performance and abrasive personality vitiate any possible contractual claim which would form the basis for a claimed deprivation of a fourteenth amendment property right.

Hillis' procedural due process theory is similarly untenable. A nontenured professor has no constitutional right to a hearing absent a protected property interest or liberty interest. *Board of Regents v. Roth*, 408 U.S. at 576–77, 92 S.Ct. at 2708–09, and Hillis has proven neither. Moreover, under SFA procedures set out in Faculty Handbook No. 7, which governed Hillis' term at SFA, a hearing before the Faculty Senate for nontenured professors is left to the discretion of a faculty committee. This procedure was followed in Hillis' case. Hillis' claims of academic freedom violations received a preliminary review by a faculty committee, the Fine Arts Council. The Council found no violation and therefore a full hearing before the Faculty Senate was not held. Subsequently, the AAUP concurred in the finding that Hillis' academic freedom had not been violated. The procedural rights Hillis received were constitutionally sufficient.

Finally, Hillis alleges that his refusal to assign the grade of "B" to Ms. Perkins was protected by the "full panoply of constitutional and judicial recognition of the broad principle of academic freedom." More specifically, he claims academic freedom to be an intellectual right implied by the first and reserved by the ninth amendments. *See Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). Hillis' attorneys, in

support of their claim for additional attorney's fees, claim: "Academic freedom is an amorphous field about which a great deal has been said in esoteric law journal articles and academic publications, but little determined in explicit, concrete judicial opinions." This is nearer the mark. While academic freedom is well recognized, *e. g. Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), *Keyishian v. Board of Regents*, 385 U.S. at 603, 87 S.Ct. at 683 (1967), its perimeters are ill-defined and the case law defining it is inconsistent. Its roots have been found in the first amendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method. *E. g. Regents of University of California v. Bakke*, 438 U.S. 265, 311–314, 98 S.Ct. 2733, 2759–60, 57 L.Ed.2d 750 (1978); *Keyishian v. Board of Regents*, 385 U.S. at 603, 87 S.Ct. at 683; *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). *See also Board of Regents v. Roth*, 408 U.S. at 580–82, 92 S.Ct. at 2710–11 (Douglas, J. dissenting); *In re Dinnan*, 661 F.2d 426 (5th Cir. 1981); *Sterzing v. Fort Bend Independent School District*, 496 F.2d 92, 93 (5th Cir. 1974). However, the record here fails to establish that the defendants sought to "cast a pall of orthodoxy," over Hillis' classes. *Keyishian v. Board of Regents*, 385 U.S. at 603, 87 S.Ct. at 683. Hillis' claim that the refusal to assign a grade to Kelly Perkins constituted a "teaching method" is unfounded.

A nontenured teacher may be fired for any reason or for no reason at all but not for the exercise of constitutionally protected rights. *Perry v. Sinderman*, 408 U.S. 593, 597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). Hillis' only credible first amendment claims related to his criticism of Delaney which the record shows played no part in SFA's decision to terminate him. He failed to establish any censorship of the content or method of his teaching.

The judgment appealed from is

REVERSED.