Matthew James **LOVELACE,**
**Plaintiff, Appellant,**

v.

**SOUTHEASTERN MASSACHUSETTS UNIVERSITY, et al., Defendants,**
**Appellees.**

No. 85–1795.

United States Court of Appeals,
First Circuit.

Submitted March 7, 1986.
Decided June 16, 1986.

Matthew J. Lovelace, pro se.

Walter R. Smith and Burke & Smith, P.C., for appellees.

Before COFFIN, BREYER and TORRUELLA, Circuit Judges.

PER CURIAM.

Plaintiff-appellant, whose contract to teach at defendant Southeastern Massachusetts University was not renewed, brought this civil rights action complaining of the non-renewal and sundry other matters. The district court granted defendants' motion for summary judgment, and plaintiff appealed. We affirm.

## I. *Procedural Due Process*

Plaintiff's first argument is that he was deprived of due process when his contract was not renewed without first affording him a pre-non-renewal hearing. Absent a property interest in continued employment or the infringement of a liberty interest, plaintiff was not constitutionally entitled to a hearing. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). For the reasons which follow, we conclude no constitutionally protected property or liberty interest was infringed.

### A. *Property*

The uncontested fact is that by letter dated July 19, 1982, plaintiff was offered a teaching appointment for a finite, definite term, specifically, "the period September 1, 1982 to June 30, 1983." Normally, such a clear contractual provision would make plaintiff a probationary employee with no property interest in employment beyond the specified term. Plaintiff says this is not so for a number of reasons, each of which we discuss in turn.

First, plaintiff contends that the Board of Trustees/Faculty Federation Agreement of July 1, 1980 (hereafter, Federation Agreement), which was incorporated by reference in plaintiff's one-year contract, guaranteed that plaintiff could not be denied reappointment absent "justification." Consequently, plaintiff claims, absent "just cause" for non-renewal, he had a constitutionally protected interest in further employment.

Article XI D of the Federation agreement governs appointments. It provides that non-tenured faculty are to be considered for reappointment in accordance with the following criteria: teaching effectiveness, research and publications, professional activities, service to the academic community, participation in community affairs associated with the member's area of professional competence. Article XI enumerates the various levels recommendation will go through, directs each level to review the previous level's evaluation and recommendations, and states as follows:

"In the development of all recommendations for reappointment or non-renewal, *justification* of all recommendations must be included. The Department Chairperson is responsible for articulating the basis of the departmental decision." (Emphasis not in original.)

The final decision to renew or not is made by the University President or the Board of Trustees. Article XI provides,

"On the basis of a review of these evaluations and recommendations, the President will make a decision for reappointment or non-reappointment. However, the Board of Trustees at its own initiative, can review and take further action or no action."

Relying on the article's direction that "justification" for recommendations be stated and the article's specification of the criteria—teaching effectiveness, etc.—to be considered, plaintiff concludes that absent "just cause" or "justification" he was entitled to reappointment. We disagree.

In *Beitzell v. Jeffrey*, 643 F.2d 870 (1st Cir. 1981), we rejected a similar claim that the specification of criteria for promotion and tenure—which criteria were much like the ones set forth in Article XI—conferred a property interest in obtaining tenure. As was explained there, in view of the substantial commitment a university makes to an individual by granting him tenure, universities have a strong need for, and traditionally have enjoyed a wide discretion in, exercising what is largely a subjective judgment in deciding to whom to grant tenure. By specifying in writing the usual criteria for promotion—teaching, scholarship, service—a university does not thereby set objective criteria, constricting its traditional discretion or transforming a largely judgmental decisional process into an automatic right to, or property interest in, tenure. *Id.* at 875–876. That reappointment, rather than tenure, is at stake in the present case does not affect our conclusion, for plaintiff's argument would apply as well to one as to the other. Nor does the fact that each level was to state a "justification" for its recommendation make a difference. Rather than signifying a relinquishment of the university's normal discretion, that requirement, we think, simply proceduralized the information gathering process and served to facilitate the president in exercising his judgment and reaching a decision by ensuring that he would have the written opinions of relevant persons in the university hierarchy before him when he was ready to act.

■ Second, plaintiff relies on Article XI, D, 2 of the Federation Agreement for his claim that he had a property interest in reappointment. This section provides that "[n]otification of the reappointment or non-renewal of the second year of service must be given by March 1 of the first year of service." In the present case, by letter dated February 28, 1983, the president informed plaintiff he would not be reappointed. Plaintiff maintains he did not receive the letter until eight or so days after the March 1 deadline, and, because the deadline was missed, he contends his contract was automatically renewed.

We see no basis on which it could be concluded that such a trivial tardiness would result in the substantial consequence of automatic renewal. The cases on which plaintiff relies for the proposition that late notice results in automatic reemployment are all readily distinguishable. In *Norwood v. School District Re-11J*, 44 Colo. App. 40, 613 P.2d 343 (1980), *aff'd*, 644 P.2d 13 (1982), *La Temple v. Wamsley*, 549 F.2d 185, 188 (10th Cir.1977), and *Burkett v. Tuslaw Local School District Board of Education*, 380 F.Supp. 812 (N.D. Ohio 1974), a statute or contract specifically indicated that unless notice to the contrary were given by a specified date, the teacher would be automatically reemployed. In contrast, plaintiff's contract had no such clear language. Rather, the Federation Agreement called for notice one way or the other—whether reappointment or non-renewal—to be given by March 1. Consequently, plaintiff could have no legitimate expectation that lack of notice by March 1 meant he had been automatically rehired. Instead, the only reasonable assumption was that notice was late. Nor does *Assaf v. University of Texas System*, 399 F.Supp. 1245 (S.D.Tex.1975), *appeal dismissed*, 557 F.2d 822 (5th Cir.1977), assist plaintiff, for it is of no precedential value in view of the Supreme Court's action in vacating the judgment and remanding the case to the district court with directions to dismiss the case as moot. *University of Texas System v. Assaf*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978). As for *Roumani v. Leestamper*, 330 F.Supp. 1248 (D.Mass. 1971), there, the teacher, in addition to receiving no notice of non-renewal by the specified date had thereafter received written notice of the president's intention to recommend renewal and the reasons the president gave for his subsequent about face arguably impugned plaintiff's integrity, giving rise to a protected liberty interest. And *Greene v. Howard University*, 412 F.2d 1128 (D.C.Cir.1969), is similar to *Roumani* in that the one teacher about whom any facts are given in the opinion had been recommended for rehiring, had

been assigned his next semester course and requested to produce a reading list after the timetable for notice of non-renewal had long since passed, and had "for all practical intents and purposes" been rehired when the University in late June believing the teacher to have been actively involved in serious campus disturbances, notified him he would not be reappointed.

 Third, plaintiff bases a property interest in an alleged oral contract. According to plaintiff, several days after he received the letter informing him that the president would not recommend renewal, plaintiff was called to a meeting in Dean Ward's office. Dean Ward said that after the president had written the non-renewal letter, the president received information indicating plaintiff was a better teacher than the president had originally thought. He thereupon told Dean Ward to tell plaintiff that if the student evaluations for plaintiff's courses improved, the president would renew plaintiff's contract after the spring semester. Plaintiff says the student evaluations for his spring courses were better than those for the fall, he brought this improvement to the president's attention, but the president, in violation of the alleged oral agreement, did not renew plaintiff's contract.

Where a college or university has a written, formalized tenure procedure, courts have generally rejected claims that a plaintiff has somehow acquired de facto tenure or a legitimate expectation of continued employment outside of and apart from the codified process. This is because one of the very purposes of formalizing hiring procedures is to avoid the type of de facto tenure recognized in *Perry v. Sinderman,* 408 U.S. 593, 601–603, 92 S.C. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). Consequently, when there is a written system of which the employee is aware, it generally will not be reasonable for the employee to rely on employment assurances made outside of the formalized system. *See, e.g., Haimowitz v. University of Nevada,* 579 F.2d 526, 528 (9th Cir.1978) ("the existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances"; summary judgment for university); *McElearney v. University of Illinois,* 612 F.2d 285, 287, 290–291 (7th Cir.1979) (same; probationary employee's action based on claim of de facto tenure dismissed for failure to state a claim).

We think much the same is true in the present case where the issue is reappointment rather than tenure, for, in similar manner, the codification in a collective bargaining agreement of the procedure for reappointment or contract renewal makes it unlikely that a person either will be or can reasonably expect to have been reappointed in a manner outside of and in variance with the formal procedure.

Plaintiff, however, relies on *Soni v. Board of Trustees,* 513 F.2d 347 (6th Cir. 1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), where, despite a plaintiff's full awareness that he had not been formally awarded tenure under the university's normal, written procedure, the court nevertheless concluded that, in view of the manner in which the university had acted toward plaintiff, plaintiff had acquired a legitimate expectation of continued employment and therefore could not be terminated without an appropriate notice and a hearing. *Id.* at 351.

*Soni* is but an illustration of truly extraordinary circumstances where de facto rights can be acquired, and it does not aid plaintiff. Plaintiff has not alleged assurances or conduct toward him at all equivalent to those involved in *Soni.* Rather, plaintiff has claimed that he was told that if the president decided that students' evaluation "improved," plaintiff would be rehired. "Improvement" is an elusive, judgmental concept. Viewed against the contractual backdrop of the Federation Agreement under which the decision to renew an expired contract is committed to the president's discretion, this oral statement was, as a matter of law, too indefinite to confer any contractual or other rights. It would defy reason to conclude that the president

would unilaterally [1] relinquish his authority and responsibility to assess plaintiff's performance and substitute therefor some objective standard of improvement of the type plaintiff describes in terms of percentage rise in the average rating score accorded plaintiff by plaintiff's pupils. Rather, the only reasonable interpretation of the president's alleged remark that plaintiff would be rehired were the evaluations to improve is that the president would be the judge of whether sufficient improvement to warrant renewal had been attained.

■ Fourth, plaintiff variously contends he had either a four year contract or a "property right in twenty-six years of employment acquired by a de facto tenure that he had in his contract." The allegations which, plaintiff says, support this claim are the following. Prior to being hired, plaintiff informed Dr. Legault, the Dean of the Business School, that under no circumstances would he be interested in "a visiting appointment (non-tenure track— fixed term contract)," but he would consider a "tenure track appointment (seven year track with either tenure or a termination notice after the seventh year)." Thereafter, Dr. Legault offered plaintiff a "tenure track contract," agreed to give plaintiff three years advance standing in the track, waived the doctorate degree normally required for consideration, and told plaintiff that in recent years all the faculty voted on for tenure had received it.

Plaintiff's July 19, 1982 contract did specify plaintiff would receive three years teaching credit and there also is language there which plaintiff construes as waiving the doctorate requirement. Plaintiff reads the three years' credit and doctorate waiver in conjunction with the fact that under the Federation Agreement tenure decisions were to be made by the seventh year of teaching to mean that plaintiff was ensured of at least four years employment at Southeastern University. In view of the July 19, 1982 contract language which clearly limited plaintiff's appointment to the period September 1, 1982 to June 30, 1983, plaintiff's reading is unsupported, and none of plaintiff's allegations create a triable issue concerning a four or twenty-six year contract. Nor would Dr. Legault's statement that in the recent past no one had been denied tenure establish any property right. Such a statement was not a promise or guarantee that plaintiff would be granted tenure, but rather at most was a description of what had previously happened. *See Bertot v. School District No. 1*, 522 F.2d 1171, 1176–1177 (10th Cir.1975) (Board member's statement that Board had never failed to rehire a teacher since 1966 did not constitute a promise of rehire).

### B. *Liberty Interest*

■ The letter informing plaintiff that his contract would not be renewed stated in material part as follows:

> "Dr. Wetmore and Dean Ward recommended your reappointment. However, after reviewing reservations contained in that material and upon further investigation, I find the problems you have had in teaching to be sufficiently severe to warrant not reappointing you."

Neither this letter nor anything else plaintiff alleged states a claim of injury to a constitutionally protected liberty interest. *Beitzell v. Jeffrey*, 643 F.2d 870, 878 (1st Cir.1981) (neither recommendation of non-renewal nor discussion of teaching inadequacies infringes liberty interest in reputation).

In summary, we have concluded that plaintiff had no property interest in continued employment and that his non-renewal did not stigmatize him. Consequently, the university was not constitutionally required either to justify its decision not to renew plaintiff's contract or to afford plaintiff procedural protections.

---

1. Plaintiff argues that the "consideration" for the president's "promise" was plaintiff's actual receipt of "improved" evaluations. But plaintiff already was under an obligation to provide teaching services, which process would, in normal course, result in student evaluations being filled out.

## II. *Violation of contractual grievance procedure*

After plaintiff's contract was not renewed, he invoked the Federation Agreement's grievance procedures to challenge the non-renewal, but did not prevail in those proceedings. Plaintiff contends that defendants rigged the grievance procedure, gave false testimony, and in other ways interfered with his processing of his claim. In so doing, plaintiff says, defendants violated the Federation Agreement and abridged plaintiff's right to petition the government for redress of grievances.

None of plaintiff's allegations state a claim of violation of the right to petition the government for redress of grievances.

Since we have concluded that plaintiff had no property interest in continued employment and that non-renewal did not affect any liberty interest, defendants were not *constitutionally* obligated to afford plaintiff any process to challenge the non-renewal. Consequently, even if the grievance proceedings accorded neither with that process which would have been required had plaintiff had a constitutionally protected interest nor with the provisions specified in the Federation Agreement, departure from the contractual grievance procedure did not violate the civil rights acts. *See Bleeker v. Dukakis*, 665 F.2d 401, 403 (1st Cir.1981) ("where state officials violate the terms of an employment contract that does not create a constitutional 'property' interest in the job itself, the proper remedy lies in a suit for breach of contract, not a § 1983 action"). At most, plaintiff alleged a contractual claim, but as plaintiff's federal civil rights claims were meritless and as there was no independent federal jurisdictional basis for the contract claim, the district court was not required to entertain it.

Plaintiff contends, however, that defendants' motivation for "rigging" the grievance procedure and interfering with plaintiff's pursuit of contractual remedies was to punish plaintiff for exercising his first amendment rights. We deal with plaintiff's first amendment claim in part III.

## III. *First Amendment*

Plaintiff claims that the real reason his contract was not renewed and his grievances were rejected or interfered with is because he refused to inflate his grades or lower his expectations and teaching standards. He contends that, in response to student complaints that homework assignments were too time consuming and that plaintiff's courses were too hard, defendants first threatened not to renew plaintiff's contract unless he appeased the students and then carried out their threat when plaintiff refused to lower his standards. This, plaintiff says, interfered with his academic freedom which, plaintiff maintains, is protected by the first amendment.

It is important to note what plaintiff's first amendment claim is and to separate speech from action. Plaintiff has not contended that he was retaliated against simply because he *advocated* that the university elevate its standards. Indeed, plaintiff would be hard pressed to support such a claim in view of the February 11, 1983 memorandum from Dean Ward which plaintiff placed in the record. The memo indicates that as a result of consultations with plaintiff about the student complaints, the Dean concluded upgrading of the lower level computer courses was warranted. Far from manifesting hostility towards voiced concerns about educational matters, the memo suggests a spirit of receptivity to faculty concerns. Plaintiff's complaint instead is that he was retaliated against when he refused to *change* his standards.

We will assume for purposes of this opinion that plaintiff's refusal to lower his standards was a substantial motivating factor, *see Mount Health Board of Education v. Doyle*, 429 U.S. 274, 283–284, 97 S.Ct. 568, 574–575, 50 L.Ed.2d 471 (1977), in the decision not to renew his contract. We nevertheless conclude that plaintiff has failed to state a constitutional claim.

Whether a school sets itself up to attract and serve only the best and the brightest students or whether it instead gears its standard to a broader, more average popu-

lation is a policy decision which, we think, universities must be allowed to set. And matters such as course content, homework load, and grading policy are core university concerns, integral to implementation of this policy decision. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759–2760, 57 L.Ed.2d 750 (1978) (the "four essential freedoms" of a university are "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study") (quoting *Sweeney v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957)). To accept plaintiff's contention that an untenured teacher's grading policy is constitutionally protected and insulates him from discharge when his standards conflict with those of the university[2] would be to constrict the university in defining and performing its educational mission. The first amendment does not require that each nontenured professor be made a sovereign unto himself. *See Palmer v. Board of Education*, 603 F.2d 1271 (7th Cir.1979) (first amendment rights of probationary kindergarten teacher not violated by discharging her for refusing to teach patriotic subjects; a public school teacher is not free to disregard the prescribed curriculum concerning patriotic matter), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980); *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972) (rejecting contention that university teacher has first amendment right to disregard established curriculum content), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Hetrick v. Martin*, 480 F.2d 705 (6th Cir.) (first amendment does not prevent university from terminating untenured teacher whose pedagogical style and philosophy did not conform with those of the school's adminis-

tration), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973).

Nor do we find that *Hillis v. Stephen F. Austin State University*, 665 F.2d 547 (5th Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), or the other cases on which plaintiff relies require a different result in the circumstance of the present case. In *Hillis*, a teacher, who had been directed to give a specified student a B grade, claimed his refusal to do so was protected by the first amendment and that his subsequent contract nonrenewal was in retaliation for the refusal. Similar to the present case, two distinct matters were potentially at issue: 1) whether plaintiff's *speech* in protesting the directive was protected and 2) whether plaintiff's *action* in disobeying the directive was protected. The court noted this speech/action distinction, *id.* at 550 (the grade incident "involved plain insubordination as one component, and *arguably* included Hillis' first amendment—protected criticism as another") (emphasis added), and, we think, implied—though did not decide—that the former component—the insubordination in refusing to grade as directed—would not be protected. In any event, because the court concluded that the grading incident was not a substantial motivating factor in the decision not to renew Hillis' contract, the court never decided whether Hillis' activity was protected, and thus the case does not assist plaintiff.

Having found no merit in any of plaintiff's arguments, we affirm the district court judgment.

---

2. It is true that plaintiff contends that his grading policy was in fact in accordance with the university's published criteria. We think, however, that it must be university officials—and not either an untenured teacher in his first year at the university or a federal court—which must be the judge of that, at least in the context of the constitutional claim plaintiff asserts.

Plaintiff also contends that the Federation Agreement guaranteed him academic freedom and this guaranty was violated by the university's alleged action in attempting to coerce plaintiff to alter grades. If that were so, plaintiff at most would state a contract claim, not a constitutional one.