Timothy KIRKLAND, Plaintiff–Appellee,

v.

NORTHSIDE INDEPENDENT SCHOOL
DISTRICT, Defendant–Appellant.

No. 88–5640.

United States Court of Appeals,
Fifth Circuit.

Dec. 22, 1989.

curricula, without first procuring administrative approval.

We conclude that the teacher's use of the supplemental list does not fall within the rubric of constitutionally protected speech. The case presents a matter of private, not public concern. It is misleading to suggest, as the teacher does here, that this dispute touches upon the public's concern over censorship of books and one's ideological views. Since school officials were never afforded an opportunity to pass judgment upon the reading list, such censorship, or the threat thereof, is entirely speculative.

We conclude that the first amendment does not vest public school teachers with authority to disregard established administrative mechanisms for approval of reading lists. Public schools have a legitimate pedagogical interest in shaping their own secondary school curricula and in demanding that their teachers adhere to official reading lists unless separate materials are approved. The first amendment has never required school districts to abdicate control over public school curricula to the unfettered discretion of individual teachers.

We conclude that the district court erred in failing to hold as a matter of law that the teacher suffered no impairment of his first amendment rights and that this case involves a private dispute concerning his qualifications for continued teaching employment. Irrespective of the jury verdict, the school district is not liable to the plaintiff under section 1983 in light of the facts presented and, accordingly, we reverse.

Emerson Banack, Jr., William T. Armstrong, Nan P. Seidenfeld, Foster, Lewis, Langley, Gardner & Banack, San Antonio, Tex., for defendant-appellant.

James A. Kosub, Kosub & Gaul, San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This civil rights action arose as a consequence of the non-renewal of a probationary teacher's employment contract. The nontenured public school teacher sought relief under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. We are asked to decide whether the first amendment empowers public school instructors to teach from their own individual reading lists, in substitution for those supplied by schools as part of their official

I.

Plaintiff Timothy Kirkland served as a probationary history teacher for two academic years at a high school within the defendant Northside Independent School District ("Northside"). Northside declined to renew Kirkland's employment contract for the 1988–89 academic year, allegedly as a consequence of his use of a nonapproved reading list in his world history class, poor supervision of a special-discipline class, substandard teaching evaluations, and poor

interaction with parents, students, and fellow teachers. Kirkland believes that his supervisors' complaints are pretextual justifications for nonrenewal of his contract; he asserts that in fact Northside dismissed him in order to censor the contents of his supplemental reading list.

It is undisputed that Northside provided Kirkland with a supplemental reading list for his 1986–87 history classes along with a copy of the guidelines used to develop and amend that list. Kirkland was aware of the guidelines and understood that, if he were dissatisfied, a separate body of reading material could be used in his classes if he obtained administrative approval. Kirkland, however, declined to procure Northside's approval of his substitute list[1] and, accordingly, Northside was never afforded the opportunity to review the list.

Northside's supplemental reading list for world history included approximately ninety books, several of which are works of fiction.[2] By comparison, Kirkland's list of forty-seven books are almost *exclusively* fictional.[3] Significantly, most of the books on Kirkland's list were already recommended reading for Northside's English courses, and all were available in the school's library.

As a general principle, Northside's reading lists for its separate courses are compiled for classroom use through an administrative process in which input is solicited at public hearings from parents, teachers, and professional educators.[4] Northside's guidelines require that books under consideration for addition to reading lists must conform to several criteria, two of which are imposed without exception: (1) The material must be examined and recommended by a member of Northside's staff, and (2) the material must "implement or enrich" the curriculum. Other criteria are applied selectively, depending upon the nature of the book scrutinized.[5]

School officials responsible for supervising Kirkland recommended that his contract not be renewed at the end of 1987–88 academic year, and he received timely notice of Northside's decision to dismiss him upon completion of his contract. Upon request, he was heard before Northside's Board of Trustees, who reaffirmed the recommendation.

Kirkland sued Northside, alleging violations of his procedural due process and first amendment guarantees, as well as state law contractual violations. The case was tried before a jury. Upon completion of the evidence, the court rendered a partial directed verdict in favor of Northside as to the procedural due process and contractual claims. The court concluded that a probationary teacher was not entitled to procedural due process protection and that, since Kirkland was not terminated before the expiration of the academic year, no state law breach-of-contract claim existed.

1. Kirkland offered his world history students his own reading list for purposes of extra credit, affording them the opportunity to read the material and submit book reports.

2. The fictional books on Northside's list include Orwell's *Animal Farm*, Lederer's *The Ugly American*, Herr's *Dispatches*, Fenelon's *Playing for Time*, Dickens's *Great Expectations*, Cervantes's *Don Quixote of the Mancha*, White's *The Once and Future King*, and More's *Utopia*.

3. For purposes of extra credit in world history, Kirkland recommended such novels as London's *Call of the Wild*, Knowles's *A Separate Peace*, Kafka's *The Trial*, Hemmingway's *A Farewell to Arms*, Fitzgerald's *The Great Gatsby*, Defoe's *Robinson Crusoe*, and Conrad's *Heart of Darkness*. The list also included spy novels, such as LeCarre's *Tinker, Tailor, Soldier, Spy* and Ludlum's *The Parsifal Mosaic*.

4. Kirkland admitted to never having attended public hearings to register objections to the world history list supplied to him or to the use of school-supplied lists in general.

5. The cost of the recommended book can be considered. In addition, depending upon the age of the student readers, books can be eliminated because of their treatment of profanity, sex, or violence. Materials designed to promote religion or indoctrinate students, or that have no historical value, are deemed not suitable for approval. Moreover, materials that "unfairly, inaccurately, or viciously treat a particular race, sex, ethnic group, age group, [or] religion" cannot be selected unless a "legitimate educational purpose" is demonstrated.

Nevertheless, the court refused to direct a verdict as to the remaining first amendment claim. Despite Northside's motion, the court declined to address the preliminary legal issue of whether Kirkland's reading list constituted protected speech under the first amendment. Instead, over Northside's objection the court submitted, to the jury, special interrogatories that effectively delegated the first amendment determination thereto.[6]

The jury answered the special interrogatories in favor of Kirkland and awarded $50,000 in damages. The trial court awarded attorneys' fees and postjudgment interest and ordered Northside to renew Kirkland's teaching contract for the following academic year. On appeal, Northside advances the argument that the court committed reversible error in not making the initial legal determination that the first amendment does not even apply in this dispute and, alternatively, that Kirkland is not entitled to reinstatement.[7] It asserts that this dispute is entirely a matter of private concern involving one teacher's employment qualifications.

Kirkland does not appeal the directed verdict rendered against him with respect to the procedural due process or state law contractual claims. However, he does argue that this case involves blatant censorship of his ideological views and that, as such, it raises a matter of public concern under first amendment jurisprudence. Specifically, plaintiff urges that school officials cannot squelch nonconforming viewpoints regarding what should be taught in public classrooms. Since matters of public concern, such as censorship, that are raised by public school teachers merit first amendment protection and bar retaliatory discharge, Kirkland believes that the trial court committed no error in submitting the special interrogatories to the jury and in ordering reinstatement after the favorable verdict.

## II.

The first amendment's concise guarantee that every citizen may freely criticize the government without retaliation requires that we determine, in this case, whether a school district has breached this commandment with respect to one of its teachers. To prevail on his constitutional claim, Kirkland must establish a prima facie case (1) that his supplemental reading list is constitutionally protected speech and (2) that such speech proved to be a substantial or motivating factor in the decision not to rehire him. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Ferrara v. Mills,* 781 F.2d 1508, 1512 (11th Cir.1986). If Kirkland successfully carries the initial burden, Northside, in order to avoid liability, must then demonstrate by a preponderance of the evidence that it would not have rehired Kirkland even in the absence of the protected speech. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court announced that the question of whether a public employee's speech is constitutionally protected turns upon the "public" or "private" nature of such speech. *See id.* at 146–48, 103 S.Ct. at 1689–91; *Ferrara,* 781 F.2d at 1512. The distinction is based upon the principle that "speech on public issues occupies the 'highest rung of the heirarchy [sic] of First Amendment values' and is entitled to special protection." *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 (citing *NAACP v. Claiborne Hardware Co.,* 458

---

**6.** Special interrogatory number 1 provides,
Do you find that the plaintiff has established, by a preponderance of the evidence, that the defendant disapproved of the book list that he distributed to his students in order to suppress an ideological or religious viewpoint with which the defendant disagreed?
Special interrogatory number 2 states,
Do you find that the plaintiff has established, by a preponderance of the evidence, that the plaintiff's distribution of the book list was a substantial or motivating factor in the defendant's decision not to renew his contract?

**7.** Because this appeal turns upon the threshold determination that the first amendment does not apply here, we need not address the issue of reinstatement. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (federal courts will not intrude into employment decisions if the speech in question is not constitutionally protected).

U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982), and *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)). For purposes of appellate review, the "inquiry into the protected status of speech is one of law, not fact." *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. Consequently, we are entitled to review *de novo* the trial court's determination concerning the protected nature of Kirkland's reading list.[8]

The definition of "matters of public concern" is imprecise.[9] As the *Connick* Court stated, "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147–48, 103 S.Ct. at 1690–91; *Moore v. City of Kilgore,* 877 F.2d 364, 369 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989). For our purposes, the concept is perhaps best understood by scrutinizing what has or has not been held to be a matter of public concern.[10]

■ It is well settled that even nontenured public school teachers do not shed first amendment protection in speaking on matters of public concern. *See Mt. Healthy,* 429 U.S. at 283–84, 97 S.Ct. at 574–75; *Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737; *Givhan,* 439 U.S. at 415–16, 99 S.Ct. at 696–97; *Hillis v. Stephen F. Austin State Univ.,* 665 F.2d 547, 549 (5th Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The rationale is that public employees are entitled to the same measure of constitutional protection as enjoyed by their civilian counterparts when speaking as "citizens" and not as "employees." *See Terrell,* 792 F.2d at 1362. Thus, issues do not rise to a level of "public concern" by virtue of the speaker's interest in the subject matter; rather, they

---

**8.** *See Page v. DeLaune,* 837 F.2d 233, 237 (5th Cir.1988) (question of whether an employee's speech addresses a matter of public concern merits independent review of record as a whole); *Terrell v. University of Tex. Sys. Police,* 792 F.2d 1360, 1362 n. 2 (5th Cir.1986) (same), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987).

**9.** Justice Scalia notes that the concept of "public concern" has been described variously, but all attempts fail to advance the definition beyond the circular statement that "speech on matters of public concern is that speech which lies 'at the heart of the First Amendment's protection.'" *Rankin v. McPherson,* 483 U.S. 378, 395, 107 S.Ct. 2891, 2902, 97 L.Ed.2d 315 (1987) (Scalia, J., dissenting) (citing *First Nat'l Bank v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978)).

**10.** For example, protesting the President's policies by commenting favorably upon an assassination attempt against his life is a matter of "public concern" meriting protection. *Rankin v. McPherson, id.* 483 U.S. at 386–87, 107 S.Ct. at 2897–98. Similarly, a public school teacher may publicly protest the school board's allocation of resources between athletics and academics, *Pickering v. Board of Educ.,* 391 U.S. 563, 571, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968), or a school's alleged racially discriminatory policy in a private conversation with the principal, without suffering retaliatory dismissal, *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). We have held that public

employees raise matters of public concern if they criticize the special attention paid by the police to a wealthy neighborhood, *Thomas v. Harris County,* 784 F.2d 648, 653 (5th Cir.1986), or the implementation of a federally funded reading program, *Wells v. Hico Ind. School Dist.,* 736 F.2d 243, 249 (5th Cir.1984), *cert. dismissed,* 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). Moreover, the quality of nursing care given to a group of people, including inmates, is a matter of public concern, *Frazier v. King,* 873 F.2d 820, 825 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989), as is the adequacy of a fire department's level of manpower, *Moore v. City of Kilgore,* 877 F.2d at 370–71.

However, public employees raise matters of "private concern" if they criticize the morale problems or transfer policies at the district attorney's office, *Connick,* 461 U.S. at 148–49, 103 S.Ct. at 1690–91; or criticize the performance of co-employees and supervisors, *Moore v. Mississippi Valley State Univ.,* 871 F.2d 545, 550–51 (5th Cir.1989); *Terrell,* 792 F.2d at 1362–63; or protest an employer's unfavorable job evaluation, *Berg v. Hunter,* 854 F.2d 238, 243–44 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989); *Day v. South Park Ind. School Dist.,* 768 F.2d 696, 700 (5th Cir. 1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986). *See generally* Allred, "From *Connick* to Confusion: The Struggle To Define Speech on Matters of Public Concern," 64 Ind.L.J. 43 (1988) (noting the difficulty which courts have had since *Connick* in defining what constitutes public speech).

achieve that protected status if the words or conduct are conveyed by the teacher in his *role as a citizen* and not in his *role as an employee* of the school district.[11] *Accord id.*

■ If the nature of the speech is purely private, such as a dispute over one employee's job performance,[12] a nontenured school teacher enjoys no first amendment protection as to that speech. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690.[13] Judicial inquiry then comes to an end, and the question of whether the employee's speech was a substantial or motivating factor in the decision not to rehire him need not even be reached. *Ferrara,* 781 F.2d at 1512.

If, however, the employee's speech relates to a matter of "public concern" and is deemed to have been a substantial or motivating factor in failing to rehire the teacher, the inquiry advances. At this point, courts must balance "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. *Accord Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896; *Connick,* 461 U.S. at 140, 103 S.Ct. at 1686; *Givhan,* 439 U.S. at 414, 99 S.Ct. at 696.

■ *Pickering* thus recognizes that a teacher's free speech protection, even as to a matter of public concern, is not absolute. *Ferrara,* 781 F.2d at 1513. "[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. Consequently, a public school employer who retaliates against a teacher for engaging in protected speech does not *automatically* violate the Constitution. *Ferrara,* 781 F.2d at 1513.

■ *Pickering* recognizes the need to balance competing interests. For example, situations may exist in which the need for confidentiality between the governmental employer and employee is so great, or the relationship is so personal and intimate in nature, that public criticism of the employer may furnish grounds for dismissal without violating the first amendment. 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. Nevertheless, should the factual analysis advance to a balancing of the employer's and employee's interests under *Pickering,* the employee's offensive words or conduct cannot be scrutinized in a vacuum. Federal courts should focus upon the manner, time, and place of the employee's expression, as well as the context in which the dispute arose. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2898. *Accord Connick,* 461 U.S. at 152–53, 103 S.Ct. at 1692–93; *Givhan,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4; *Price v. Brittain,* 874 F.2d 252, 256–59 (5th Cir.1989).

### III.

■ Having set the analytic framework, we conclude that the inquiry here does not

---

**11.** As the *Connick* Court stated, "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." 461 U.S. at 149, 103 S.Ct. at 1691. The Court also carefully noted that a matter "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Id.* at 148 n. 8, 103 S.Ct. at 1691 n. 8.

**12.** *See Day,* 768 F.2d at 700 (teacher's dispute with principal concerning negative performance evaluation is "purely a private matter"); *Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir.1972) (teacher's dispute with colleagues and superiors about course content not a matter of public concern),

*cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973).

**13.** When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. *Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90.

advance to a balancing of Kirkland's and Northside's interests under *Pickering*. In fact, it fails to advance beyond the threshold inquiry of whether the case presents a matter of public or private concern. With little difficulty, we find that Kirkland's use of his separate reading list for world history is not a matter of public concern under the facts presented.

Irrespective of Kirkland's interest in the subject matter of reading lists, Kirkland did not speak out as a citizen when he offered a separate body of material for world history. He never attended public meetings to register his opposition to Northside's world history reading list; prior to the adverse employment decision, he never announced to colleagues, superiors, or the public that the school-supplied list impinged upon his right to speak freely; and, most significantly, he never afforded Northside an opportunity to pass upon the merits of his list. Since most of Kirkland's recommended material was already included in the lists of other academic subjects, and all were otherwise available in the school library, Kirkland's fear of censorship is entirely speculative. He raised the issue of censorship only after school officials decided not to renew his contract; Kirkland now attempts, unpersuasively, to cloak his substandard job performance in first amendment protection.

This case differs from most first amendment disputes in that Kirkland remained mute with respect to Northside's so-called "brutal censorship" until notified of Northside's decision not to rehire him. In *Terrell*, we held that a police officer suffered

no first amendment injury when he was fired as a consequence of critical comments aimed at the police chief, written in strict confidence in the officer's own notebook. 792 F.2d at 1362. We were persuaded by the fact that the discharged officer "made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have any occasion to do so." *Id.* at 1362–63.

Thus, while an employee need not publicly announce a matter of general concern in protest, and may use private channels instead,[14] he cannot remain mute and thereafter self-servingly label his conduct to be a matter of public concern.[15] Kirkland had ample opportunity to present any concerns over censorship, either privately to his supervisors or publicly to Northside's trustees. He admitted that he fully understood that administrative guidelines were available in order to have a substitute list approved. However, he declined to act or to speak upon the very matter which he equated, before the jury, with nazi-style censorship.

Contrary to Kirkland's suggestion, this case fails to present a matter of public concern with respect to censorship of reading material or a teacher's "academic freedom." Although the concept of academic freedom has been recognized in our jurisprudence,[16] the doctrine has never conferred upon teachers the control of public school curricula.[17]

In *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court recognized

---

**14.** See *Givhan*, 439 U.S. at 413, 99 S.Ct. at 695 (teacher's private communication with principal concerning alleged racially discriminatory policies protected by first amendment).

**15.** See also *Fowler v. Board of Educ.*, 819 F.2d 657, 663–64 (6th Cir.) (teacher's showing of R-rated movie to students as entertainment while grades were being posted was not expressive or communicative within meaning of first amendment), *cert. denied*, 484 U.S. 986, 108 S.Ct. 502, 98 L.Ed.2d 501 (1987).

**16.** See *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (academic freedom is "a special concern of the First Amendment, which does not tolerate

laws that cast a pall of orthodoxy over the classroom"); *Hillis*, 665 F.2d at 553 (academic freedom is recognized in the case law but is ill-defined).

**17.** See, e.g., *Lovelace v. Southeastern Mass. Univ.*, 793 F.2d 419, 426 (1st Cir.1986) ("first amendment does not require that each nontenured professor be made a sovereign unto himself" with respect to course content, homework and grading policy); *Hillis*, 665 F.2d at 552–53 (teachers do not have first amendment right to control grading); *Palmer v. Board of Educ.*, 603 F.2d 1271, 1273 (7th Cir.1979) ("First Amendment [is] not a teacher license for uncontrolled expression at variance with established curricu-

that public school officials could impose, consistently with the first amendment, reasonable restrictions upon the subject matter of a student-published newspaper. Since schools are typically not public forums, *id.* at 267, 108 S.Ct. at 567–68, restrictions upon speech can be imposed in public schools as long as the constraints are "reasonably related to legitimate pedagogical concerns," *id.* at 273, 108 S.Ct. at 571. Although the Court focused upon students' speech, it nonetheless recognized that if, as here, no public forum has been created, "school officials may impose reasonable restrictions on the speech of students, *teachers*, and other members of the school community." *Id.* at 267, 108 S.Ct. at 568 (emphasis added).[18]

Kirkland, however, adopts the position that his control of the world history class curriculum is unlimited.[19] At trial, he stated during cross-examination that, although it would be professionally unwise, he could freely use sexually explicit magazines in his classroom instruction. At oral argument, his counsel also admitted that, if so inclined, Kirkland could limit reading material to subject matter consistent with his own political concerns, such as nuclear disarmament, despite being entrusted with the teaching of a class in world history.

We reject Kirkland's position concerning the scope of his first amendment rights as being at odds with controlling, well-settled precedent. Moreover, if the efforts of Northside to restrict teachers' control over the public school curricula were deemed to constitute "censorship," so presumably would Kirkland's attempts to override to preferences of the trustees, administrators, and parents.[20] While teachers may have special competence in methods of class-

room instruction, they have no special skill in making final curricular decisions. "The power to teach, inform, and lead is also the power to indoctrinate, distort judgment, and perpetuate the current regime." Yudof, "When Governments Speak: Toward a Theory of Government Expression and the First Amendment," 57 Tex.L.Rev. 863, 865 (1979). It does not matter, for purposes of influencing young minds, whether such power is exercised, to the exclusion of others, by the government or public school teachers.

Kirkland's reliance upon *Givhan*, for the proposition that the district court properly submitted the first amendment issue to the jury, is also misplaced. *Givhan* is distinguishable in that the teacher in that case protested the allegedly racially discriminatory policy, admittedly a public concern, in a private conversation with her superior. She did not, like Kirkland, hold her silence and then allege a first amendment tort when her contract was not renewed.

Kirkland never afforded Northside the opportunity to approve his list and, in addition, he never spoke as a citizen either through public or private channels. Having remained mute as to any censorship he may have suffered, he belatedly suggests that Northside's decision not to renew his contract was inspired, in a substantial or motivating degree, by a desire to retaliate against him for his exercise of free speech. The facts do not support his conclusion.

■ Our decision should not be misconstrued as suggesting that a teacher's creativity is incompatible with the first amendment, nor is it intended to suggest that public school teachers foster free debate in their classrooms only at their own risk or that their classrooms must be "cast with a

---

lar content"), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980); *Hetrick v. Martin,* 480 F.2d 705, 709 (6th Cir.) (first amendment not violated when school refused to rehire teacher because her teaching philosophy was incompatible with the pedagogical aims of university), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973).

**18.** *See also* Hafen, *"Hazelwood School District* and the Role of First Amendment Institutions," 1988 Duke L.J. 685, 704–05 (first amendment protects not only individual students and teach-

ers, but the educational integrity of public schools).

**19.** Kirkland is not alone when he argues that his authority to shape public school curricula supersedes that of competing groups. It appears to be a position increasingly adopted by school teachers. *See* Ingber, "Socialization, Indoctrination, or the 'Pall of Orthodoxy': Value Training in the Public Schools," 1987 U.Ill.L.Rev. 15, 34–37.

**20.** *See* Ingber, *supra* note 19, at 37.

pall of orthodoxy." We hold only that public school teachers are not free, under the first amendment, to arrogate control of curricula. Parents, administrators, and elected officials also have a legitimate role in the process of selecting material that will advance educational goals, a role that cannot lightly be assumed by teachers alone. Thus, when an administrative process is established to compile and amend officially approved material with input from parents, administrators, and educators, teachers must respect that process.

## IV.

In summary, we conclude that Kirkland's world history reading list does not present a matter of public concern and that this case presents nothing more than an ordinary employment dispute. Accordingly, Kirkland's conduct in disregarding Northside's administrative process does not constitute protected speech, and any inquiry into the reasons for the nonrenewal of his employment contract is unnecessary. The district court erred when it failed to hold as a matter of law that Kirkland suffered no constitutional injury. We thus REVERSE the judgment of the district court and RENDER judgment in favor of Northside.